**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARMING CHARLIE HOLDINGS INC., *et al.*,[1] | ) Case No. 17-12906 (CSS) |
| | ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF ROBERT ADAMEK,**
**CHIEF FINANCIAL OFFICER OF CHARMING CHARLIE HOLDINGS INC.,**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Robert Adamek, hereby declare under penalty of perjury:

1.      I am the Senior Vice President and Chief Financial Officer of Charming Charlie Holdings Inc. ("Holdings"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Charming Charlie").

2.      I have served in these roles since November 2016.  From September 2012 to November 2016, I served as the Senior Vice President and Chief Financial and Operations Officer of Haggar Clothing Co.  From September 2011 to September 2012, I was the Director of the Program Management Office of Neiman Marcus.  I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Charming Charlie Canada LLC (0693); Charming Charlie Holdings Inc. (6139); Charming Charlie International LLC (5887); Charming Charlie LLC (0263); Charming Charlie Manhattan LLC (7408); Charming Charlie USA, Inc. (3973); and Poseidon Partners CMS, Inc. (3302).  The location of the Debtors' service address is: 5999 Savoy Drive, Houston, Texas 77036.

commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed today.

3.      Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

### Preliminary Statement

4.      Founded in 2004, Charming Charlie is a leading specialty retailer focused on colorful fashion jewelry, handbags, apparel, gifts, and beauty products.  Headquartered in Houston, Texas, Charming Charlie expanded to over 390 locations spread across the United States, Canada, the Middle East, and the Philippines in a 12-year period.  With a loyal customer base, the "Charlie Experience" focuses on four key elements: color, value, variety, and fun.  Charming Charlie has a distinctive color-focused merchandising model where key products are available in a wide array of colors and store merchandise is organized on a color basis, creating an aesthetically unique experience.

5.      Charming Charlie, like many other retail and apparel-focused companies, has suffered as of late from adverse macro-trends, as well as certain operational shortfalls.  More specifically, the general shift from brick-and-mortar retail has been further exacerbated by merchandising miscalculations, lack of inventory, an overly broad vendor base, all of which has led to underperformance and reduced sales, with consolidated net revenue declining over 22% and EBITDA declining over 75% in the last several fiscal years.

6.     In the face of these challenges, Charming Charlie recently initiated an operational "rebirth" premised on three core strategies: (a) a comprehensive "Back-to-Basics" plan that simplifies Charming Charlie's operational and business model and reinforces the brand's core strengths; (b) a streamlined vendor approach to optimize vendor use, shorten the period from product concept to in-store stocking, and improve vendor response time; and (c) the shuttering of underperforming locations.  While these initiatives will serve as the backbone for a viable long-term operation, Charming Charlie's current cash balances are less than $1 million, and there is only approximately $1.8 million of availability under its revolving credit facility.  Simply put, Charming Charlie is out of cash to responsibly operate its business.

7.     Charming Charlie has been operating without sufficient liquidity throughout the fall of 2017.  Cash-on-delivery demands have paralyzed the stream inventory.  Efforts to secure incremental liquidity or an actionable holistic solution to these issues did not bear fruit.  And as a result, Charming Charlie was unable to secure appropriate inventory for the November and December holiday season.

8.     After various attempts to secure capital, these circumstances led to negotiations with Charming Charlie's secured lenders and certain majority owners regarding the terms of a comprehensive restructuring that would, among other things, provide immediate access to liquidity and effectuate both an operational and balance sheet restructuring.  These negotiations were successful.

9.     In connection with the filing of these chapter 11 cases, Charming Charlie has entered into a restructuring support agreement with more than 80% of its prepetition secured term loan lenders (collectively, the "Ad Hoc Group of Term Loan Lenders") and its majority equity owners.  The Term Sheet contemplates an immediate infusion of capital (through two debtor in

possession financing facilities) and a comprehensive restructuring on an expedited timeline. Specifically, the key terms of the restructuring are as follows:

- **DIP Financing**.  The Debtors have secured a (a) $35 million DIP ABL Facility and (b) $60 million Term Loan DIP Facility, which includes $20 million of new capital.  Immediate access to the DIP Facilities, including $10 million available under the Term Loan DIP Facility on interim basis, is crucial for Charming Charlie to operate and purchase inventory in late December necessary for the upcoming spring season.

- **Debt for Equity Conversion**.  The proposed restructuring contemplates a deleveraging of more than $100 million with the support of the prepetition secured term loan lenders.  If successful, the reorganized capital structure contemplates a $35 million new revolving credit facility and $50 million in new secured term (through two tranches of term loans).

- **Milestones**.  The restructuring contemplates various milestones along the Debtors' path to emergence from chapter 11, including the filing of a chapter 11 plan and disclosure statement within 10 business days of the Petition Date and emergence within 95 business days of the Petition Date.

10.     In addition, Charming Charlie is working closely with its advisors on closing underperforming stores and negotiating go-forward concessions with remaining landlords to ensure long-term viability.[2]  In parallel with its restructuring negotiations, on November 30, 2017, Charming Charlie commenced store closings for approximately 100 underperforming stores and, simultaneously, initiated discussions with its various landlords.  Charming Charlie expects to complete these 100 store closings (and vacate such premises) by December 31, 2017.

11.     The key to achieving the restructuring is speed and cooperation.  Access to new capital is not endless.  On the contrary, the new money is highly conditioned on moving quickly through these cases with support from all major stakeholders, including lenders, trade vendors, and landlords.  In an ever-shifting retail landscape that has seen dozens of casualties in 2017,

---

[2]     Charming Charlie is working with A&G Realty Partners, LLC ("A&G") and Hilco Merchant Resources, LLC ("Hilco") on real estate strategy and store closings.

Charming Charlie has a real possibility of a bright future so long as all parties in interest work collaboratively to ensure that these cases stay on track.

12.    To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in those certain motions and applications filed contemporaneously herewith, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing, marketing process, and chapter 11 plan; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the first day pleadings.

## I.    The Charming Charlie Brand.

13.    Charming Charlie was founded by Charles Chanaratsopon in 2004.  In less than a decade, Charming Charlie grew into a $400 million-plus (in sales) empire of watches, necklaces, scarves and handbags.  By 2013, Charming Charlie had grown into 284 stores in 40 states, valued at over $1 billion.[3]  Additionally, in 2013, Charming Charlie was awarded *The Accessories Council's* "Specialty Retailer" ACE Award, ranked number 745 on *Inc. Magazine's* annual list of "Top 5,000 Fastest Growing Businesses," and was featured on *Forbes Magazine's* "Ones to Watch" list.

---

[3]    Brian Solomon, *Speed Demon: How 'Charming Charlie' Built A Hit Fashion Chain In Under A Decade*, FORBES (Nov. 27, 2013, 8:00 AM), https://www.forbes.com/sites/briansolomon/2013/11/27/speed-demon-how-charming-charlie-chanaratsopon-built-a-billion-dollar-fashion-chain-in-under-a-decade/.

14.    With a loyal customer base, consisting primarily of women aged 35–55, the "Charlie Experience" focuses on four key elements—color, value, variety, and fun.  Charming Charlie has a distinctive color-focused merchandising model in which key products are available in an extraordinarily wide array of colors and store merchandise is organized on a color basis, creating an aesthetically unique experience.  Charming Charlie's products are competitively priced in the "sweet spot" between more expensive stores (*e.g.*, Kohl's and Macy's) and stores that cater to a younger market (*e.g.*, Claire's).  Since its founding, Charming Charlie has been on a colorful and purposeful mission to make fashion fun.  Charming Charlie offers women unique products that are both in-style and affordable.  Store locations are stocked with jewelry, handbags, eyewear, scarves, shoes, and thousands of accessories grouped together across a range of colors to fit any occasion.

15.    While the goal of a fun and unique customer experience has always been foremost at Charming Charlie, unpredictable merchandising miscalculations coupled with industry-wide challenges have led to high operating costs and depressed profits in recent years.  Importantly, however, a loyal customer following, an experienced management team, the company's new "Back-to-Basics" plan, and the comprehensive deleveraging provided by the restructuring support agreement (the "RSA") and accompanying term sheet (the "Term Sheet"), attached hereto as **Exhibit C**, should give Charming Charlie's stakeholders confidence that the company has a clear path to return to strength.  D

A.    **Charming Charlie's Business Operations.**

1.    **Charming Charlie's Geographical and Digital Presence.**

16.    ***Brick-and-Mortar Presence***.  Charming Charlie has both a national and international presence, operating approximately 370 locations across 42 states nationwide, with an additional 20 locations internationally, comprised of four company-owned locations in Canada, 14

franchised locations in the Middle East, and two franchised locations in the Philippines.  Retail stores are located in lifestyle centers, shopping malls, power centers, street level shops, and outlets.  Currently, California, Florida, and Texas host the most brick-and-mortar locations with approximately 76 locations in total.  The following map depicts the footprint of Charming Charlie's domestic retail locations as of the Petition Date:



17.    ***The E-Commerce Platform***.  In addition to a robust physical footprint, Charming Charlie maintains a robust online presence.  Customers can seek out the latest style advice, fashion tips, trends, and styles complete with video tutorials on the Charming Charlie website.  Additionally, customers may purchase merchandise via the Debtors' eCommerce platform.  A user-friendly and well-curated eCommerce online platform is crucial to ensuring a seamless customer experience.  To that end, Charming Charlie is investing time and resources to expand and improve its website to compete with richer experiences provided by certain of its competitors.

**2.    Overview of Charming Charlie's Merchandise and Key Customer Base.**

18.    As discussed, Charming Charlie offers specialty handbags, apparel, fashion jewelry, and beauty products.  Historically, Charming Charlie utilized a sophisticated inventory system to position products according to their color and theme.  Merchandise is offered in as many

as 26 different hues and arranged at each store according to the item's color and theme, creating what has been referred to as a "treasure hunt" experience. While this approach initially provided Charming Charlie with a strategic benefit, and engendered significant brand loyalty, it eventually caused Charming Charlie to be saddled with excess merchandise in underperforming color offerings.

19.     Notwithstanding that approach, consumers continue to rely on Charming Charlie for trendy and affordable merchandise. Inventory prices are benchmarked by Charming Charlie's merchants and typically range from $5 to $50, and up to $125, providing Charming Charlie with a competitive advantage over other select specialty retailers and department stores (*e.g.*, Kohl's, Macy's, JC Penney). For example, many of the handbags sold by the company are similar in style to premium, expensive lifestyle brands, but are offered at a lower price point that is more accessible to the average consumer.

20.     Charming Charlie's inventory price point and demographics cover a wide range, reflective of the variety of products stocked in its stores and the tastes of its customers. Charming Charlie's jewelry selection remains its strongest product offering, historically buoying company-wide margins above 60%. Charming Charlie places an emphasis on outfit solutions to provide its customers with complete outfits, including fashion accessions, jewelry, and handbags. Traditionally, this approach has required offering a wide assortment of tops, dresses, and other apparel pieces in regular and plus-sizes across 26 color varieties. Essential to the brand is the promise of a wide range of products that are unique, innovative, and reflective the latest trends. For example, items perfect for gifts and special occasions are widely available, including, bridal gifts, holiday themed merchandise, gifts perfect for pets, and baby showers and reveals.

21.     Charming Charlie's loyal customer base shops regularly in its stores and is an advocate for the brand.  The customer base consists of women of all ages and spending preferences, with women aged 35 to 55 composing Charming Charlie's core customer base.  These core consumers shop at Charming Charlie approximately three times per year and represent approximately 38% of its customer base.  Average shopping frequency ranges from three times a year for high spenders (spending an average of $89.43 per visit) to twice a year for low spenders (spending approximately $30–$71.64 per visit).  Customer conversion across Charming Charlie's customer base ranges from 35%–38%.

**B.     Critical Components of the Debtors' Cost Structure.**

**1.     Supply Chain.**

22.     The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations.   Generally, the Debtors contract with various domestic vendors to design and source the merchandise from foreign manufacturers, located predominantly in the People's Republic of China, India, and Vietnam.  In limited circumstances, the Debtors contract with foreign manufacturers directly.  Depending on the nature of the Debtors' arrangement with a given vendor or manufacturer, the Debtors ship the merchandise to a warehouse located in Houston, Texas, that serves as the Debtors' distribution center.  As discussed in greater detail below, as part of the "Back-to-Basics" plan, Charming Charlie is taking active steps to both streamline its vendor base as well as shift to domestic vendors to accelerate its receipt of goods.

**2.     Employee Compensation and Benefits.**

23.     The Debtors employ approximately 5,665 employees, including approximately 1,065 full-time employees and approximately 4,600 part-time employees (collectively, the "Employees").  In light of the Debtors' planned store closings and related reductions in force,[4]

the Debtors anticipate that their monthly gross Employee Compensation, including wages, salaries, and related compensation, will range from approximately $4 million to approximately $8 million during the pendency of these chapter 11 cases.   The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical and dental plans, life insurance, accidental death and dismemberment insurance, disability benefits, workers' compensation, retirement plans, non-insider incentive programs, paid time off, severance, director compensation, and other employee benefit plans.   The Debtors anticipate that their payment on account of these employee benefit plans will range from approximately $1.1 million to approximately $1.4 million during the pendency of these chapter 11 cases.   As the Debtors implement right-sizing measures, including a reduced physical store footprint, the Debtors believe a more efficient allocation of employees will present a significant opportunity for savings.

### 3.    Real Estate Obligations.

24.    The Debtors lease all of their store locations. The Debtors estimate that the aggregate occupancy costs for the Debtors' go-forward freestanding stores will be approximately $52.4 million in fiscal year 2017, excluding tenant amortization.  The Debtors lease approximately 219,615 total square feet of office space in Houston, Texas, consisting of (a) their corporate headquarters (approximately 36,026 square feet), a building jointly-owned by Eric, LLC and Aundrea, LLC, (b) additional office space (approximately 42,148 square feet), a building owned by Sierra Assets Group, LLC, and (c) their distribution center (approximately 141,441 square feet), a building owned by GLP US Management, LLC.   The Debtors anticipate 276 go-forward locations following the first round of store closures (described in greater detail below).   The

---

[4]    The Debtors planned store closing are discussed in more detail in *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief*, filed contemporaneously herewith.

remaining store presence is anticipated to be comprised of 132 lifestyle centers, 85 shopping malls, 53 power centers, 2 street stores, and 4 outlets.

## II.    The Debtors' Prepetition Corporate and Capital Structure.

25.    The chart, attached hereto as **Exhibit B,** depicts the Debtors' current corporate and capital structure.  Holdings and each of its U.S.-incorporated subsidiaries that are obligors (either as a borrower or guarantor) under the ABL Facility and the Term Loan Facility are Debtors in these chapter 11 cases.

26.    As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $154 million, including the ABL Facility and the Term Loan Facility.[5]  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Interest Rates | Principal Amount Outstanding |
|---|---|---|---|
| **ABL Facility** | June 2020[6] | Libor + 2.25–2.50% | $22.0 million |
| | | Prime Rate + 1.25–1.50% | |
| **Term Loan Facility** | December 2019 | Libor + 8.00% | $132 million |
| | | Base Rate + 7.00% | |
| **TOTAL** | | | $154 million |

### A.    The ABL Revolving Credit Facility.

27.    Charming Charlie LLC and Charming Charlie USA, Inc. ("CC USA") are parties to that certain Credit Agreement, dated as of June 22, 2015, (as amended, the "ABL Facility") by and among Charming Charlie LLC, as lead borrower, CC USA, as borrower, the guarantors party

---

[5]    Charming Charlie LLC is also a party to certain lease agreements (collectively, the "Capital Leases") whereby it leases approximately 23 vehicles for use primarily by store managers and approximately three printers (collectively, the "Leased Assets") utilized in the ordinary course of business.  Under the Capital Leases, Charming Charlie LLC is indebted in the aggregate amount of approximately $235,651.  The Capital Leases mature in 2020, and are secured by a first-priority lien on the Leased Assets.

[6]    The June 2020 maturity date of the ABL Facility springs to November 2019 (i.e., 45 days before the maturity of the Term Loan Facility) if the Term Loan Facility is not repaid or refinanced prior to that date.

thereto,[7] the lenders party thereto from time to time (the "ABL Lenders"), and Bank of America, N.A., as administrative agent and collateral agent for itself and the ABL Lenders (in such capacities, together with its successors and assigns, the "ABL Agent"). The ABL Facility provides for a $55 million senior secured revolving credit facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date that is the earlier of (a) June 22, 2020 or (b) 45 days prior to the stated maturity date of the Term Loan Facility and any permitted refinancing thereof.

28.    The ABL Facility provides for LIBOR loans and Prime Rate loans. The LIBOR loans bear interest at LIBOR plus an applicable margin of (a) 2.25% if the Average Daily Excess Availability Percentage (as defined in the ABL Facility Credit Agreement) exceeds 25% or (b) 2.50% if the Average Daily Excess Availability Percentage is equal to 25% or less. The borrower can elect interest periods with respect to the LIBOR loans, provided that interest payments under these loans occur at least every three months. The Prime Rate loans bear interest at a Prime Rate (equal to the higher of (a) the applicable prime lending rate, (b) 0.50% above the overnight federal funds rate, or (c) 1.00% above LIBOR, subject to a 0.25% floor), plus an applicable margin of (x) 1.25% if the Average Daily Excess Availability Percentage exceeds 25% or (y) 1.50 % if the Average Daily Excess Availability Percentage is 25% or less.

29.    Interest on the Prime Rate loans is paid on the first day of each calendar quarter. Obligations under the ABL Facility are secured by an all asset lien, including, without limitation, a first priority lien on the Debtors' accounts (including receivables), inventory, deposit accounts, security accounts, cash, and cash equivalents, and a second priority lien on certain other property of the grantors, including, without limitation the Debtors' intellectual property and all equity

---

[7]    The guarantors under the ABL Facility are Holdings, Poseidon Partners CMS, Inc. ("Poseidon"), Charming Charlie Manhattan LLC ("CC Manhattan"), Charming Charlie International LLC, ("CC International"), and Charming Charlie Canada LLC ("CC Canada").

interests of the Debtors and their subsidiaries (collectively, the "ABL Collateral").  Each non-borrower Debtor has guaranteed all obligations under the ABL Facility.

30.    Additionally, the Debtors have entered into deposit account control agreements in favor of the ABL Agent with respect to their bank accounts.  Thus, substantially all of the Debtors' cash is subject to a perfected security interest in favor of the ABL Agent.  Under the ABL Facility, if excess availability is less than either (a) 12.5% of the then-applicable borrowing base (or, if less, the total commitments) or (b) $5 million, the Debtors must remit all cash receipts on a daily basis to a non-Debtor account maintained by the ABL Agent (the "Agent Account").  Due to the Debtors' ongoing liquidity constraints, the excess availability under the ABL Facility was less than 12.5% as of the Petition Date and has been constrained for many months preceding the Petition Date.  Accordingly, each day, any excess cash is swept to the Agent Account and applied to prepay loans in accordance with the ABL Facility. As of the Petition Date, there is approximately $1.8 million of availability under the ABL Facility Facility.

### B.    The Term Loan Facility.

31.    Charming Charlie LLC is party to that certain Amended and Restated Term Loan and Guarantee Agreement, dated as of December 24, 2013 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Term Loan Facility"), among Holdings, Charming Charlie LLC, as borrower, certain of the Debtors as guarantor parties thereto,[8] the lenders from time to time parties thereto, and Wilmington Savings Trust., as administrative agent (in such capacity, the "Term Loan Agent").  The Term Loan Facility provides for a loan in an original principal amount of $150 million, with a maturity date of December 24, 2019.  CC USA, in addition to certain Debtors,

---

[8]    The guarantors under the Term Loan Facility are Holdings, Poseidon, CC Manhattan, CC International, CC Canada, and CC USA.

has guaranteed all obligations under the Term Loan Facility.  Obligations under the Term Loan Facility are secured by an all assets lien, including, without limitation, a second priority lien on the Debtors' accounts (including receivables), inventory, deposit accounts, security accounts, cash, and cash equivalents and a first priority lien on certain other property of the Debtors, including, without limitation, the Debtors' intellectual property and all equity interests of the Debtors and their subsidiaries (collectively, the "Term Loan Collateral").

32.     The Term Loan Facility provides for LIBOR loans and Base Rate loans.  The LIBOR loans bear interest (per annum) at LIBOR (with a 1.00% floor) plus an 8.00% margin.  The Base Rate loans bear interest (per annum) at Base Rate (equal to the the higher of (a) the applicable prime lending rate, (b) 0.50% above the overnight federal funds rate, or (c) 1.00% above LIBOR, subject to a 2.00% floor) plus a 7.00% margin.  Additionally, the LIBOR loans and the Base Rate loans bear PIK interest, the rate of which varies based on the borrower's total leverage ratio, as shown in the table below (provided, that such rates are increased by 1.00% in the event the ABL Facility is in cash dominion):

| Total Leverage Ratio | PIK Interest Rate |
|:---:|:---:|
| > 4.25x | 3.00% |
| 3.25x - 3.75x | 1.50% |
| 3.25x - 3.75x | 1.00% |
| 2.75x - 3.25x | 0.75% |
| < 2.75x | 0.25% |

33.     As of the Petition Date, approximately $131.3 million in aggregate principal amount remained outstanding under the Term Loan Facility, and approximately $773,000 in PIK Interest accrued to balance, for a total outstanding balance of approximately $132 million.

C.      **The Intercreditor Agreement.**

34.      The relative lien priorities between the ABL Facility and the Term Loan Facility are set forth in that certain Intercreditor Agreement, dated as of December 24, 2013, (as amended, the "Intercreditor Agreement"), by and among the ABL Agent (as successor to Wells Fargo Bank, N.A.) and the Term Loan Agent.  In addition to lien priorities, the Intercreditor Agreement governs the respective rights, interests, obligations, and positions of (a) the ABL Agent and the Term Loan Agent and (b) the ABL Lenders and the Term Lenders under the ABL Facility and the Term Loan Facility.  The DIP Facilities largely preserve the priority scheme set forth in the Intercreditor Agreement.

D.      **Common and Preferred Equity Interests.**

35.      As of the Petition Date, Charlie Chanaratsopon, the Debtors' former Chief Executive Officer and founder, and his family directly or indirectly hold approximately 70 percent of the common equity interests of Holdings.  Hancock Park Capital III, L.P. ("Hancock") directly holds approximately 26.5 percent of the common equity interests of Holdings, and the remaining approximately 3.5 percent of the common equity interests is held by various individuals and investment firms.

36.      The Debtors' capital structure also includes two series of preferred equity: (a) Series T Preferred Stock, valued at approximately $85.70 million, and (b) Junior Preferred Stock, valued at approximately $10.4 million.  As of the Petition Date, TSG Consumer Partners ("TSG"), a private equity company, indirectly holds approximately 95.2 percent of the Series T Preferred Stock.  Certain other investors hold the remaining 4.8 percent of outstanding Series T Preferred Stock.  As of the Petition Date, each of Mr. Chanaratsopon and Hancock holds approximately 29 percent of the Junior Preferred Stock of Holdings.  The remaining approximately 42 percent of Junior Preferred Stock is held by various individuals and investment firms.  Each of

(a) Mr. Chanaratsopon and the interests he directly and indirectly holds, (b) Hancock, and (c) TSG are parties to the RSA.

>   **E.**      **The 2013 Recapitalization.**

37.      On December 24, 2013, the Debtors completed a series of recapitalization transactions (the "Recapitalization") whereby (a) twelve million shares of Junior Preferred Stock in Holdings were converted into 72 million shares of common equity interests of Holdings on a split-adjusted basis; (b) certain majority owners invested $79 million in cash (before expenses) in exchange for Series T Preferred Stock; and (c) the Debtors entered into the Term Loan Facility. The proceeds of such transactions were used to (a) repurchase approximately 51.6 million common equity interests of Holdings, or approximately 40% of the outstanding common equity, after giving effect to the equity split and (b) increase the Debtors' physical footprint. The Debtors recorded a $234.2 million decrease in retained earnings to reflect the equity repurchase and subsequent retirement of such interests.

## III.   **Events Leading to these Chapter 11 Cases.**

38.      A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These include macroeconomic factors—including most significantly, the general downturn in the retail industry, which has led to a decrease in sales and the marked shift away from brick-and-mortar retail to online channels. These also include microeconomic factors—including an overly broad vendor base, a delayed timeline on obtaining new inventory while being saddled with excess, unprofitable inventory, and a disproportionately large physical footprint. Over time, these factors have tightened the Debtors' liquidity and complicated their relationship with their vendors. As described above and in further detail below, these factors culminated in a liquidity crisis by the fall of 2017, when Charming Charlie faced dwindling cash flows,

inaccessible inventory, the inability to access even incremental liquidity, and holiday sales projections well under historical numbers.

### A.    Challenging Operating Environment and Operational Right-Sizing.

39.    The Debtors, along with many other apparel and retail companies, have faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores.  Given the Debtors' substantial brick-and-mortar presence, and the expenses associated therewith, the Debtors' business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets.  The combination of the above factors, and others plaguing the retail industry as a whole, contributed to the Debtors falling short of their sale targets and depressed profitability performance.

40.    In addition to the challenges facing brick-and-mortar stores, the Debtors have also suffered from recent merchandising miscalculations that have contributed to the decline in EBITDA.  These missteps have occurred in both product selection and brand execution. *First*, Charming Charlie's continued emphasis on jewelry exposed the Debtors to sensitivity in an overall declining jewelry market.  Whereas the fashion industry suffered a 15% downturn in fashion jewelry sales, Charming Charlie, by contrast, suffered a 22% decrease.  This loss in sales is due, in part, to an over commitment to color strategy that promotes the offering of limited merchandise in 26 color varieties at the expense of a wide variety of merchandise generally.  An overabundance of unsold inventory in various colors led to stale inventory and prompted significant markdowns with minimal margins.  *Second*, the brand suffered from an unsuccessful redesign.  Specifically, Charming Charlie implemented a strategy in the third quarter of 2014 that attempted to redefine the brand by, among other things, eliminating key styles and product categories.  Unfortunately, this approach inadvertently disenfranchised Charming Charlie's core

customers (who had come to expect the wide assortment of variety and style central to the Charming Charlie brand) and resulted in a dramatic decline in traffic and conversion rates. *Third*, the Charming Charlie brand became reactive, missing opportunities to timely allocate resources to projects likely to produce a higher rate of investment.   *Fourth*, efforts to control expenses resulted in lagging markdowns that eroded profit margins.   The liquidity challenges of 2017 further exacerbated missed trends and excess sale inventory, both compounded by an overly complex merchandising strategy.

### B.     Supply Chain and Borrowing Base Challenges.

41.     As the Debtors' liquidity has tightened, supply chain vendors have begun to place pressure on the supply chain cost structure.   Beginning in late July 2017, merchandise shipments and inventory receipts began to slow due to liquidity tightness and a lack of vendor and factor support.   Prior the Petition Date, substantial numbers of vendors refused to ship inventory unless the Debtors paid cash on delivery, resulting in shelf-ready merchandise being stranded. Specifically, a substantial volume of inventory that is critical to for the upcoming spring season lies dormant in distribution centers and ports and is inaccessible due to a lack of liquidity necessary to satisfy vendors.   Consequently, Charming Charlie is materially behind its inventory receipt plan by approximately $45 million.   The lack of fresh and sufficient inventory further tightens the Debtors' liquidity (including by reducing the borrowing base under the ABL Facility), creating a negative feedback loop.   Without the flow of fresh inventory, the Debtors' retail business will effectively starve.

42.     As is typical in the apparel industry, the Debtors' inventory levels form a substantial portion of the ABL Facility borrowing base—thus, the Debtors' inability to obtain new inventory from vendors only exacerbates the ABL Facility borrowing base constraints, which, in a vicious cycle, further constricts the Debtors' ability to secure fresh inventory.   This, combined with the

Debtors' vendors' unwillingness to ship new inventory on trade credit, has impaired the Debtors' ability to procure new inventory.

43.     A critical component of the Debtors' proposed DIP Facilities, described in greater detail below, is securing adequate liquidity so that the Debtors can obtain fresh inventory and return to trade terms with their vendors and factors.  The flow of fresh inventory is the lifeblood of retail and wholesale sales, and ensuring the uninterrupted flow of inventory to the Debtors' customers during these chapter 11 cases will maximize the value of the Debtors' estates.

**C.     Prepetition Deleveraging Initiatives.**

**1.     The May 2016 Term Loan Facility Amendments.**

44.     In May 2016, the Debtors amended the Term Loan Agreement to obtain critical relief from restrictive financial maintenance covenants.  In exchange, the Debtors were required to provide a $10 million Term Loan principal prepayment no later than May 2016, and an additional $5 million principal prepayment no later than the end of fiscal year 2016.  The initial $10 million principal prepayment of the Term Loan was funded by various investors, including Mr. Chanaratsopon and Hancock, in exchange for approximately 1.5 million shares of Series A Preferred Stock.

**2.     The July 2017 Term Loan and ABL Facility Amendments.**

45.     In July 2017, the Debtors executed amendments to both the Term Loan and ABL Facility Agreements.  Together, these amendments resulted in a modest rate increase and small fee, the implementation of transactional milestones, and greater covenant flexibility (including a ticking fee, borrower-friendly changes on the excess cash flow provisions, and agreement on certain amortization parameters).  Pursuant to these amendments, the Debtors appointed two independent board members—Larry Meyer and Lana Krauter—to the board of directors of Charming Charlie, Inc., and certain of their non-Debtor subsidiaries and affiliates.  Each of

Mr. Meyer and Ms. Krauter have significant retail experience.  Mr. Meyer previously served as the Chief Executive Officer of UNIQLO USA, a division of Japanese conglomerate Fast Retailing Co., Ltd., the Chief Financial Officer and Senior Vice President at Gymboree Group, Inc., and Chief Financial Officer at Toys "R" Us, Inc.  Ms. Krauter previously served as Executive Vice President at J.C. Penney, Senior Vice President of Sears Holdings Corp., President and Chief Marketing Officer at Beall's, Inc., and President and Chief Marketing officer at Goody's Family Clothing Inc.

46.     Since their appointment, Mr. Meyer and Ms. Krauter have played a key role in advising the Debtors' boards on operational and financial matters.  Indeed, on October 20, 2017, Ms. Krauter was appointed to serve as Interim Chief Executive Officer. In addition, and in connection with the Debtors' restructuring initiatives, Mr. Meyer was formally authorized by the Debtors' boards to conduct an investigation into the appropriateness of the RSA provisions and any potential claims or causes of action against existing lenders or owners.  The investigation commenced in the weeks preceding the Petition Date and is ongoing.

**3.     The Need for Imminent Liquidity and Covenant Relief.**

**(a)     December 2016 Cost Cutting Initiatives.**

47.     Faced with growing liquidity concerns, in mid-2016, the Debtors explored enacting cost cutting measures.  These austerity measures, implemented beginning in November 2016, impacted all aspects of the Debtors' business and operations, including store operations, advertising efforts, administrative processes, and the legal and human resources departments, among others.  The functional areas most significantly affected by these cost-cutting efforts included store payroll, advertising, and merchandise sourcing and distribution, with anticipated annual savings of approximately $15.6 million, $6.6 million, and $2.8 million, respectively.  These initiatives are ongoing.

(b)     **Efforts to Obtain a "First-In, Last-Out Term Loan" to Unlock Holiday Inventory.**

48.     Despite the December 2016 cost-cutting initiatives, the Debtors faced a liquidity crisis in the summer of 2017 following sustained market conditions and operational losses. On October 9, 2017, the Debtors re-engaged Guggenheim Securities, LLC ("Guggenheim Securities") to act as the Company's financial advisor, investment banker and/or, with respect to any private placement of securities, placement agent in connection with any restructuring transaction, any financing transaction and/or any sale transaction. The Debtors, with the assistance of Guggenheim Securities, evaluated funding alternatives necessary to obtain liquidity critical to unlocking withheld inventory and implementing Charming Charlie's go-forward business plan reflecting the "Back-to-Basics" plan.  In October 2017, the Debtors negotiated with various Term Loan Lenders to obtain a $10 million first-in, last-out term loan (the "FILO Term Loan"), secured by a first lien on ABL Priority Collateral (as defined in the Intercreditor Agreement) and a second lien on the existing Term Loan Collateral.  On October 25, 2017, the Debtors received FILO Term Loan term sheets from certain Term Loan Lenders; however, the Debtors determined that the proposed terms failed to provide a sufficient near-term solution.   Specifically, the Debtors determined that, given their severe liquidity constraints and the need to unlock inventory in advance of the critical holiday season, new money in the form of a FILO Term Loan was not feasible.

(c)     **The Third Amendment to the ABL Revolving Credit Facility.**

49.     As an alternative to the FILO Term Loan, the Debtors sought to amend the ABL Facility to obtain additional liquidity, which the ABL Lenders consented to provide.  On October 27, 2017, the Debtors, the ABL Lenders, and the ABL Agent, executed that certain third amendment to the ABL Facility (the "Third Amendment").   Among other changes, the Third

Amendment adjusted the current advance rates applicable under the ABL Facility, and temporarily reduced the Minimum Excess Availability threshold from $4 million to $2 million until December 2, 2017, allowing the Debtors to access approximately $4.5 million in incremental liquidity under the ABL Facility.

50.     In consideration for providing additional liquidity to the Debtors, the Third Amendment increased the interest rates under the ABL Facility by 0.50% per annum and included a 1.0% prepayment premium required to be paid upon termination in full of all or any portion of the commitments under the ABL Facility, acceleration of the loans thereunder, and satisfaction of the loans thereunder or termination of the ABL Facility.  As discussed in the DIP Motion, the ABL Agent and the ABL Lenders have provided further support to the Debtors by agreeing to waive this prepayment premium in connection with the DIP ABL Facility.

**4.     Concurrent Marketing Efforts.**

51.     At the same time the Debtors were exploring options for increasing liquidity and obtaining covenant relief, they worked with Guggenheim Securities to conduct a marketing process.  Guggenheim Securities and the Debtors prepared a list of 28 potential investors (including various financial sponsors and strategic buyers) that were considered likely participants in a sale process.  Following the initial outreach to the identified 28 parties, information was provided to these parties to gauge their interest prior to executing a non-disclosure agreement ("NDAs").  Thirteen parties executed NDAs.  Parties who executed NDAs received access to a dataroom.  No parties were ultimately interested in moving forward with the process.

**D.     Operational Right-Sizing Initiatives.**

**1.     Real Estate Optimization.**

52.     On November 30, 2017, the Debtors commenced the process of closing and winding down 100 brick-and-mortar store locations, primarily in Arkansas, California, Oklahoma,

Maine, Rhode Island, and Texas.  The store closures are expected to improve run-rate EBITDA by approximately $2 million and generate approximately $12.5 million of incremental liquidity.  In anticipation of these closings, the Debtors engaged Hilco to begin liquidating the inventory in the closing stores and otherwise preparing the stores for turnover to the applicable landlords. Following the store closings, the Debtors anticipate approximately 276 go-forward locations.

53.     In parallel with the store closings, the Debtors, with the assistance of A&G, commenced rent concession negotiations with landlords for the remaining store fleet on November 17, 2017.  With guidance from A&G, the Debtors developed a landlord 'ask' seeking to amend lease terms to reduce occupancy costs and obtain rent abatements for the first quarter of 2018.  The Debtors estimate the potential benefit from rent concessions for the remaining store fleet to result in approximately $9 million in annualized rent savings.  Hilco's and A&G's efforts remain ongoing as of the Petition Date.

### 2.     Launch of the "Back-to-Basics" Strategic Plan.

54.     The Debtors, recognizing the need to critically reevaluate their business, have developed a comprehensive operational restructuring to simplify their business and build on the core strengths of Charming Charlie.  This "Back-to-Basics" plan consists of six fundamental components:  (a) refocusing on product assortment; (b) realigning the vendor base; (c) enhancing the customer experience; (d) optimizing marketing; (e) implementing organizational changes; and (f) growing the company's eCommerce offering.  Fundamental to this "Back-to-Basics" plan is a realigned merchandising strategy focused on ensuring the core product categories "trend right."

### (a)     Refocusing on Product Assortment.

55.     The *first* component of the "Back-to-Basics" plan aims at shifting the company's focus and efforts to five key merchandise categories with proven profitability:  fashion jewelry, handbags, beauty, apparel, and gifts and occasion accessories.  The Debtors have elected to focus

on these categories because of their historically high profit margins, their ability to weather recessions and industry down cycles, and their growth potential. This component of the "Back-to-Basics" plan involves, among other things, a focus on trend right styles and value, strategic brand partnerships, and a renewed focus on customer demand to dictate growth of apparel.

> **(b)      Realigning the Vendor Base.**

56.      This *second* component focuses on consolidating and optimizing vendor relationships, improving inventory management, and increasing speed to market, to enable the Debtors to quickly respond to evolving customer preferences. This vendor and inventory optimization strategy includes streamlining inventory offerings and selecting proven go-forward vendors, including a 45% reduction in the vendor base that reduces total vendor count from 175 to 80. This component will also involve selectively onboarding new vendors. The Debtors believe that this strategy will lead to shorter vendor response times and a more efficient purchasing process to keep product fresh and on-trend, resulting in higher merchandise margins as the company reduces reliance on inventory markdowns to offload excess inventory.

> **(c)      Enhancing the Customer Experience.**

57.      The *third* component of the "Back-to-Basics" plan seeks to improve the customer experience to drive customer conversion. The Debtors expect to achieve that goal by (a) implementing impactful in-store marketing and event initiatives to maximize product relevance, (b) improving in-store product layout to ease navigation of key product categories and highlight competitive inventory pricing, and (c) training staff members to achieve incremental customer conversion while lessening administrative burdens so the staff can focus on sales.

> **(d)      Optimizing Marketing.**

58.      The *fourth* component of the "Back-to-Basics" plan aims to refocus the Debtors' marketing efforts on the "high spender" customer to build brand awareness and generate traffic.

This strategy involves (a) improving coordination between marketing and merchandising, (b) improving the effectiveness of existing marketing channels, (c) selectively increasing new customer acquisition efforts by, among other things, boosting messaging to lapsed customers, and (d) a redesign of Charming Charlie's customer loyalty program and brand ambassador program.

### (e)    Implementing Organizational Changes.

59.    The *fifth* component of the "Back-to-Basics" plan seeks to produce a simplified and more efficient merchant structure.  The company's merchant organization expanded prospectively with several layers as Charming Charlie grew.  As a result, the Debtors' current merchant structure impairs synchronization among the merchant organization causing a slow reaction to trends. Under the "Back-to-Basics" plan, the merchant organization will be optimized for the company's refocused merchandising and vendor strategies.  In particular, merchants will become responsible for the financial performance of all merchandise categories, which will result in efficient and coordinated merchandising and vendor strategy.

### (f)    Growing the Company's eCommerce Offering.

60.    The *final* component of the "Back-to-Basics" plan seeks to bolster the Debtors' preexisting eCommerce platform.   The Debtors' believe that eCommerce augments the brick-and-mortar model, and solidifies the seamless customer experience.   In support of this component, the Debtors are onboarding a new Vice President to spearhead eCommerce efforts, and are replacing their current fledgling standalone eCommerce system with a more effective integrated omnichannel strategy.

### E.    Departure of the Founder and Chief Executive Officer, and Appointment of the Interim Chief Executive Officer.

61.    As of October 27, 2017, Mr. Chanaratsopon no longer serves as Chief Executive Officer, although he continues to serve on the Debtors' board of directors.  Contemporaneously

therewith, Lana Krauter was appointed to serve as the Debtors' interim Chief Executive Officer. At the same time Mr. Chanaratsopon vacated his role as Chief Executive Officer, Steve Lovell, President of Charming Charlie, Inc., also stepped down from his role. Mr. Chanaratsopon and Mr. Lovell each received certain deferred compensation payments at the time of their departure.

## IV.    The Proposed DIP Financing, Marketing Process, and Chapter 11 Plan.

62.    The Debtors' negotiations with its funded debtholders and shareholders, which ultimately culminated in the RSA, Term Sheet, and DIP Facilities, were guided by three key considerations. *First*, speed is key. Given the potential business disruption and costs associated with a chapter 11 filing, it is crucial that Charming Charlie emerges from chapter 11 as quickly as possible. Charming Charlie's profit margins depend on maximizing spring 2018 holiday seasons, which require restoring inventory to the Company's shelves as quickly as possible. *Second*, cash is limited. While it was clear that Charming Charlie would need postpetition financing for the duration of their chapter 11 cases, early negotiations focused on Charming Charlie's secured stakeholders' willingness to accept equity in the reorganized Debtors (as opposed to a cash recovery) in exchange for their claims as part of a plan of reorganization. *Third*, operations must be streamlined.

### A.    The Proposed DIP Financing.

63.    In connection with a chapter 11 filing, the Debtors, with the assistance of Guggenheim Securities, initiated two parallel processes for identifying sources of capital on the best available terms: (a) negotiations with the Debtors' existing funded debt stakeholders and (b) a marketing process with potential alternatives sources of capital from parties outside the Debtors' existing capital structure. Specifically, the Debtors, with the assistance of Guggenheim Securities, began soliciting indications of interest from 11 alternative third-party sources of asset based

financing (including specialty lenders and those that routinely provide debtor-in-possession financing), to gauge their interest in providing a revolving credit facility to the Debtors.

64.     From this group, seven parties requested NDAs, and six parties signed NDAs and obtained access to the dataroom.    All parties declined to provide financing proposals. Contemporaneously, the Debtors, with the assistance of Guggenheim Securities, solicited interest from the 28 potential investors in providing postpetition funding to the Debtors, either independently or in connection with an alternative holistic restructuring proposal.  Ultimately, one party provided a financing proposal that, compared to the proposals from the Debtors' existing stakeholders, did not provide more favorable terms to the Debtors or their stakeholders.   The remaining parties declined to provide financing proposals, citing priming concerns and the likely high costs of third-party senior financing.

65.     As set forth in greater detail in the Erickson Declaration, these efforts culminated in two DIP Facilities (as discussed below, the "DIP ABL Facility" and the "Term Loan DIP Facility" and together, the "DIP Facilities").   The DIP Facilities will fund the Debtors' working capital needs and the chapter 11 process.   There are four key points to highlight with respect to the DIP Facilities.   *First*, both the DIP ABL Facility and the Term Loan DIP Facility are being provided by Charming Charlie's existing lenders.   Notably, substantially all of the Ad Hoc Group of Term Loan Lenders are participating in the Term Loan DIP Facility.   As a result, the Debtors are not facing value-destructive priming issues and have near unanimous support from their secured lenders.   *Second*, in exchange for providing mission-critical financing relief, the Debtors are seeking to convert or "roll" (i) upon entry of the interim order approving the DIP Facilities, all outstanding prepetition ABL Facility obligations into DIP ABL Facility Obligations and (ii) upon entry of the final order approving the DIP Facilities, a portion of the prepetition Term Loan Facility

obligations into Term Loan DIP Facility obligations.  The "roll-up" of prepetition secured obligations has become standard in distressed retail restructurings.

66.      ***Third***, in addition to providing critical financing during the Debtors' chapter 11 cases, the Debtors' negotiated the DIP Facilities with the express purpose of preserving cash as far as possible.  As a result, the DIP ABL Facility will pay down the claims under the ABL Facility (which, as oversecured claims, would otherwise accrue interest during the Debtors' chapter 11 cases) and the Term Loan DIP Facility will be satisfied with new debt and Reorganized HoldCo equity (as opposed to a cash recovery).  ***Fourth***, as detailed in the Erickson Declaration, despite the Debtors' intensive efforts, the Debtors could not obtain an actionable alternative DIP proposal on better terms under the circumstances.

### B.      The Proposed Chapter 11 Plan and Path to Exit.

67.      The Debtors' plan of reorganization (the "Plan"), as envisioned in the RSA, will include a toggle feature, providing for (a) the sale of all or substantially all of the Debtors' assets or (b) the debt-for-equity conversion transaction detailed by the Term Sheet.  The toggle provides the Debtors with the latitude necessary to negotiate the precise terms of their ultimate emergence from chapter 11 in a way that maximizes value for all stakeholders.  The DIP Facilities are critical to the Debtors' ability to fund their chapter 11 cases, including payments to vendors and other participants in the Debtors' supply chain that will allow the Debtors to establish a continuing and uninterrupted flow of inventory that is the foundation of their business.  Without access to the DIP Facilities, the Debtors would likely need to liquidate in the near term, to the detriment of the Debtors, their stakeholders, and all other parties-in-interest.

68.      ***Treatment of Claims***.  In the event the Debtors ultimately pursue consummation of the debt-for-equity conversion detailed in the RSA, the Debtors anticipate the following treatment of claims:

| Class of Claims | Treatment in Debt-for-Equity Conversion |
|---|---|
| **Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims** | Unimpaired. |
| **DIP ABL Claims** | Paid in full in cash on the effective date (via proceeds from exit financing to be raised) or with the consent of each holder of a DIP ABL claim, rolled into a new ABL exit facility |
| **Term Loan DIP Claims** | Approximately $50 million in new term loans (spread between two tranches) and 75% of the Reorganized HoldCo equity, subject to certain dilutions |
| **Prepetition ABL Claims** | Converted into obligations under the DIP ABL Facility upon entry of the interim order approving the DIP Facilities |
| **Prepetition Term Loan Claims** | 25% of the Reorganized HoldCo equity, subject to certain dilutions |
| **General Unsecured Claims** | To be determined |
| **Equity Claims** | 0% recovery |

69.     ***Post-Emergence Capital Structure***.  These recoveries will support the following illustrative post-emergence capital structure:

| Class of Claims | Treatment in Debt-for-Equity Conversion |
|---|---|
| **Reorganized HoldCo Equity** | To be distributed to holders of prepetition Term Loan Claims and Term Loan DIP Claims. |
| **Exit Term Loan** | • $20 million Tranche A Term Loans (pari passu with TLB)<br><br>  • Year 1: L + 5.0% in cash plus 5.0% in PIK<br><br>  • Thereafter: L + 10.0% in cash<br><br>• $30 million Tranche B Term Loan (pari passu with TLA)<br><br>  • L + 1.0% in cash plus 9.0% in PIK<br><br>  • Both the Tranche A and Tranche B Term Loans will be held in full by holders of the Term Loan DIP Claims<br><br>• TLA / TLB – Amortization / Sweeps<br><br>  • Quarterly amortization of 2.5% per year beginning year<br><br>  • Excess Cash Flow Sweep – 50% with payments split pro rata between TLA / TLB |

| | |
|---|---|
| **New Revolving Credit Facility** | $35 million New Revolving Facility to be raised at emergence or a conversion of the DIP ABL Facility into an exit facility at the Effective Date |

70.     ***Key Milestones***.    The RSA also contains limited milestones typically seen in restructuring support agreements.  As summarized below, these milestones are designed to provide a timeline to exit and provide comfort to the Debtors' key stakeholders—namely, their lenders, landlords, vendors, employees, and customers, among others—that the Debtors are pursuing an expeditious chapter 11.

- no later than ten business days from the Petition Date, the Debtors will file the Plan and disclosure statement;

- no later than fifty business days from the Petition Date, the Debtors will secure entry of the an order approving their disclosure statement;

- no later than seventy-nine business days from the Petition Date, the Debtors will secure entry of an order approving the Plan; and

- no later than ninety-five business days from the Petition Date, the Debtors will emerge from these chapter 11 cases.

71.     Preserving value for the benefit of the Debtors' estates depends in large part on the Debtors proceeding swiftly to confirmation of the Plan and minimizing the effects of the Debtors' chapter 11 cases on the value of the Debtors' brand—a critical component of the value of the Debtors' businesses.  Due to the fact that retail customer sentiment shifts rapidly and stakeholders (including key suppliers and landlords) often turn swiftly against apparel and retail debtors, such debtors often do not fare well in bankruptcy—in many instances electing to liquidate as opposed to reorganize.  The Debtors intend to swiftly proceed with a fair and efficient process to preserve and maximize the value of that achievement for enterprise-wide stakeholders.

V.     **Evidentiary Support for First Day Motions.**

72.     Contemporaneously, the Debtors have filed a number of first day pleadings seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  I believe that the relief requested in the first day motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  I have reviewed each of the first day motions discussed below and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  A description of the relief requested in and the facts supporting each of the first day motions is set forth in __Exhibit A__ attached hereto and incorporated herein by reference.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  December 11, 2017
Wilmington, Delaware

Name:  Robert Adamek
Title:    Senior Vice President and
            Chief Financial Officer

# <u>EXHIBIT A</u>

**Evidentiary Support for First Day Motions**

**Evidentiary Support for First Day Motions**[1]

I.      **Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

       1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of their related chapter 11 cases and (b) granting related relief.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

       2.      Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding, instead of multiple independent chapter 11 cases.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

II.     **Debtors' Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief (the "SOFA/Schedules Extension Motion").**

       3.      Pursuant to the SOFA/Schedules Extension Motion, the Debtors request entry of an order (a) extending the deadline by which the Debtors must file the schedules of assets and

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

liabilities, schedules of current income and expenditures, schedules of executory contracts and

unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements")

by fifteen days in addition to the extension provided by Local Rule 1007-1(b), for a total of forty-

five days from December 11, 2017, to and including January 25, 2018,[2] without prejudice to the

Debtors' ability to request additional extensions for cause shown, and (b) granting related relief.

The Debtors estimate that they have far more than 200 creditors on a consolidated basis.

The breadth of the Debtors' business operations requires the Debtors to maintain voluminous

books and records and complex accounting systems.  Given the size, complexity, and geographic

diversity of the Company's business operations, and the number of creditors, I submit that the

large amount of information that must be assembled to prepare the Schedules and Statements and

enormous expenditure of time and effort required to complete the Schedules and Statements would

be unnecessarily burdensome to the Debtors during the period of time following the Petition Date.

4.      I believe that the relief requested in the SOFA/Schedules Extension Motion is in the

best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable

the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly,

on behalf of the Debtors, I respectfully submit that the SOFA/Schedules Extension Motion should

be approved.

**III.    Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to File A Consolidated List of Creditors in Lieu of Submitting A Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and (III) Granting Related Relief (the "Creditor Matrix Motion").**

5.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an

order:  (a) authorizing the Debtors to maintain a consolidated list of creditors in lieu of submitting

---

[2]    For the avoidance of doubt, the extension requested herein will not affect in any way the Debtors' ability to comply with the milestones set forth in either the Restructuring Support Agreement or the respective agreements governing the DIP Facilities.

a separate mailing matrix for each Debtor; (b) authorizing the Debtors to redact certain personal identification information for individual creditors; and (c) granting related relief.

6.      Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix "in the interest of justice."  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.[3]

7.      Additionally, I believe that it is appropriate to authorize the Debtors to redact from the Creditor Matrix address information of individual creditors—including the Debtors' employees—and interest holders because such information could be used to perpetrate identity theft.  The Debtors propose to provide an unredacted version of the Creditor Matrix to the Office of the United States Trustee for the District of Delaware, any official committee of unsecured creditors appointed in these chapter 11 cases, and the Court.

8.      Accordingly, I respectfully submit that the Court should approve the Creditor Matrix Motion.

**IV.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief  (the "_Cash Management Motion_").**

9.      Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) continue to operate their Cash Management System; (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms in the ordinary course of business; and (iv) continue to perform Intercompany Transactions consistent

---

[3]    The Debtors submit that if any of these chapter 11 cases converts to a case under chapter 7 of the Bankruptcy Code, the applicable Debtor will file its own creditor mailing matrix.

with historical practice; (b) granting administrative expense status to postpetition Intercompany Balances; and (c) granting related relief.

10.    The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized companies to manage cash flow.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, the Debtors' corporate accounting, treasury, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

11.    Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe that it is critical that the existing Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**V.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

12.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, withholding obligations, payroll processing fees, reimbursable employee expenses, non-insider employee incentive programs and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, in an

aggregate amount not to exceed $4,303,000 pursuant to the Interim Order and $4,649,200 pursuant to the Final Order; and (b) granting related relief.

13.    The Debtors employ approximately 5,665 Employees, including approximately 1,065 full-time Employees and 4,600 part-time Employees.  The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced.  In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors, as well as temporary workers (the "Temporary Staff") to fulfill certain duties on a short- and long-term basis.

14.    The majority of Employees and Temporary Staff rely on the Employee Compensation and Benefits Programs to pay their daily living expenses.  Thus, Employees and Temporary will face significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business.  The Debtors seek to minimize the personal hardship the Employees and Temporary Staff would suffer if employee obligations are not paid when due or as expected.  Consequently, I believe the relief requested is necessary and appropriate.

15.    The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, other compensation, withholding obligations, payroll processing fees, reimbursable expenses, non-insider employee incentive programs health insurance, life and accidental death and dismemberment insurance, workers' compensation benefits, short- and long-term disability coverage, auxiliary benefits, retirement plans, paid time off, severance, and other benefits that the

Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

16.     Pursuant to the Wages Motion, the Debtors also seek authority to continue their incentive programs and to honor their obligations to non-insider Employees under the pre-existing bonus programs, described more fully in the Wages Motion.  The Debtors believe the Non-Insiders Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency of the Debtors' operations.  I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Wages Motion with respect to any bonus programs or severance payments.

17.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' business, and absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors will likely experience Employee turnover and instability at this critical time.  I believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face.  Employees may then elect to seek alternative employment opportunities.  I believe enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

18.     Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**VI.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Foreign Vendors, Shippers, and Import and Export Claimants, and (II) Granting Related Relief (the "Critical Vendors, Foreign Vendors, Shippers, and Import and Export Claimants Motion").**

19.     Pursuant to the Critical Vendors, Foreign Vendors, Shippers, and Import and Export Claimants Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to pay the Critical Vendors Claims, the Foreign Vendor Claims, the Shipper Charges, and the Import/Export Charges, in an amount not to exceed $2,640,000 all pursuant to the Interim Order (the "Interim Order Cap") and, in the aggregate, inclusive of amounts paid pursuant to the Interim Order, an amount not to exceed $3,110,000 pursuant to the Final Order (the "Final Order Cap"), in each case absent further order of the Court; and (b) granting related relief.

20.     In the ordinary course of business, the Debtors engage a limited number of providers for certain of the critical services, inventory, and other materials the Debtors depend upon to provide top-quality product and service to their customers.  The Debtors obtain such services, inventory, or materials from a limited number of highly specialized vendors, service providers, and other businesses, often on an order-by-order basis and without long-term contracts—replacement of which would likely be impossible or would result in substantially higher costs for the Debtors at this early, critical juncture in these chapter 11 case.

21.     *Critical Vendors:* Recognizing that payment of all prepetition claims of such third-party vendors outside of a plan of reorganization would be extraordinary relief, the Debtors, with the assistance of their advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and supply agreements, and analyzed

applicable laws, regulations, and historical practices to identify the limited number of vendors that are critical to the continued and uninterrupted operation of the Debtors' businesses—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and impair going-concern viability.  The Debtors estimate that they owe approximately $45 million to their vendors as of the Petition Date.  The Debtors submit that the requested relief will allow the Debtors to preserve stakeholder value by paying certain prepetition claims of certain counterparties where critical to unlock incremental liquidity for the Debtors' business enterprise.  Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case-by-case basis, the Critical Vendor Claims in an aggregate amount up to approximately $1.5 million on an interim basis and up to approximately $1.7 million on a final basis.

22.    *Foreign Vendors*: A critical component of the Debtors' supply chain involves transacting with certain foreign vendors, including by purchasing the Merchandise and other goods and materials from entities located in the People's Republic of China, India, and Vietnam (collectively, the "Foreign Vendors").  Generally, the Debtors contract with various domestic vendors to design and source the Merchandise from foreign manufacturers, located predominantly in the People's Republic of China, India, and Vietnam.  In certain circumstances, the Debtors contract with foreign manufacturers directly.  Many of these Foreign Vendors supply goods, materials, or services to the Debtors that are crucial to the Debtors' ongoing U.S. operations—specifically the Merchandise necessary to stock the shelves and racks in the Debtors' stores.

23.    The Debtors propose to pay the Foreign Vendor Claims only to the extent necessary and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to avoid disruptions to their business.  The Debtors estimate that as of the Petition Date, approximately $19.5 million is accrued and outstanding on account of Foreign Vendor Claims, of

8

which the vast majority are past due and short vendor terms may come due within the first 30 days after the Petition Date.

24.    Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case-by-case basis, the Foreign Vendor Claims in an aggregate amount up to approximately $1.0 million on an interim basis and up to approximately $1.2 million on a final basis.

25.    **_Shippers:_** The Debtors' business depends on the uninterrupted flow of inventory and other goods through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' Merchandise.  As described above, the Debtors pay various freight forwarders, common carriers, and custom brokers (collectively, the "Shippers") to transport the Merchandise.

26.    Collectively, the Debtors estimate approximately $600,000 of third-party shipping and storage charges (collectively, the "Shipper Charges") were due and owing as of the Petition Date, the vast majority of which will become due and owing within 30 days after the Petition Date.  Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case-by-case basis, the Shipper Charges in an aggregate amount up to approximately $100,000 on an interim basis and up to approximately $150,000 on a final basis.

27.    **_Import and Export Claimants_**:  In the ordinary course of their businesses, the Debtors import inventory and related materials (collectively, the "Imported Goods") from certain Foreign Vendors.  In the ordinary course, the Debtors also export inventory (collectively, the "Exported Goods") to foreign countries, including inventory to be sold in the Debtors' stores located in Canada.  Timely receipt or transmittal, as applicable, of the Imported Goods and Exported Goods is critical to both the Debtors' domestic and foreign business operations.  Any

disruption or delay would adversely affect the Debtors' business operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.

28.     In connection with the import and export of goods, the Debtors may be required to pay various charges (the "Import/Export Charges"), including customs duties, detention and demurrage fees, tariffs and excise taxes, and other similar obligations.   The Debtors pay approximately $11.0 million annually on account of Import/Export Charges.  The Debtors estimate that approximately $60,000 in Import/Export Charges for goods currently in transit is outstanding as of the Petition Date, approximately $40,000 of which will come due in the first 30 days after the Petition Date.  Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case-by-case basis, the Import/Export Charges incurred on account of prepetition transactions in an aggregate amount up to $40,000 on an interim basis and up to $60,000 on a final basis.

29.     The Debtors rely on timely and frequent delivery of critical inventory items, goods, and services and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, employees, customer base, and market share.  Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims, Foreign Vendor Claims, Shipper Charges, and Import/Export Charges.  I believe that the relief requested in the Critical Vendors, Foreign Vendors, Shippers, and Import and Export Claimants Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  I believe that the relief requested in the Critical Vendors, Foreign Vendors, Shippers, and Import and Export Claimants Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should

approve the Critical Vendors, Foreign Vendors, Shippers, and Import and Export Claimants Motion.

**VII.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief (the "Store Closing Motion").**

30.    Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to assume the Agency Agreement, authorizing and approving the continuance of 97 store closing or similar themed sales in accordance with the terms of the Store Closing Procedures, and authorizing the Debtors to conduct store closing or similarly themed sales at up to 75 additional stores in accordance with the terms of the Store Closing Procedures.

31.    Recognizing the need to right-size their store footprint to align with industry conditions, the Debtors' management team and advisors conducted an extensive analysis of the Debtors' existing store footprint, and whether and how many stores the Debtors should close in connection with their broader financial and operational restructuring initiatives.  The Debtors' management team and advisors ultimately determined that it is appropriate to close and wind down (the "Store Closings") 97 brick-and-mortar store locations and commenced the Store Closings on November 30, 2017.  The Debtors, with the assistance of A&G Realty Partners, LLC and their restructuring advisor, AlixPartners, LLC, also entered into lease modification negotiations with the Debtors' landlords to reduce rents and improve the financial performance of the Debtors' remaining store base (the "Lease Negotiations").  These negotiations are ongoing and the determination of whether or not to close up to an additional 75 stores will depend on whether the Debtors are able to negotiate more favorable lease terms and rent reductions for certain stores with their landlords.

32.    I believe that the Store Closings and the Sales provide the best and most efficient means of selling the Store Closure Assets to maximize the value to their estates.  Delay in

approving the continuance of the Store Closings would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons.  Thus, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sales of the Store Closure Assets and the termination of operations at the Stores.  Further, the swift and orderly authorization of the Sale will allow the Debtors to timely reject the applicable Store leases, and, therefore, avoid the accrual of unnecessary administrative expenses for rent payment.  Delaying the Store Closings may cause the Debtors to pay postpetition rent at many of these stores, at a possible cost to the estate of up to $1.7 million.

33.     Furthermore, I believe that assumption of the Agency Agreement will allow the Debtors to utilize the experience and resources of the Agent in performing large-scale liquidations in a format that allows the Debtors to retain control over the sale process and which will provide the maximum benefit to the estates.  Indeed, the Debtors estimate that the proceeds from the Sales will be approximately $9–10 million.  Therefore, I respectfully submit that the Court should approve the Store Closing Motion.

**VIII.   Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "Customer Programs Motion").**

34.     Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain and administer their customer-related programs (collectively, the "Customer Programs") as described in the motion and honor certain prepetition obligations related thereto and (b) granting related relief.

35.     The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors'

12

business and the value of their brand.  Accordingly, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

36.     The Debtors estimate that, of their prepetition obligations under the Customer Programs, approximately $47.3 million constitutes accrued credits, adjustments, discounts, or other similar obligations owing to their customers, the vast majority of which **do not** entail the expenditure of cash.

37.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates.  In contrast, if the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating certain customers (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects maximizing the value of their estates.  The Debtors' Customer Programs are essential marketing strategies for attracting new customers.

38.     I believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.  Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which, in turn, could adversely impact their prospects for a successful emergence from bankruptcy.

39.     I believe that the relief requested herein will pay dividends with respect to the long-term reorganization of their businesses, both in terms of profitability and the engendering of

goodwill, especially at this critical time following the filing of the chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**VIII.  Debtors' Motion Seeking Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Authorizing Fee Payments to Ecova for Services Performed, (V) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (VI) Granting Related Relief (the "Utilities Motion").**

40.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) determining adequate assurance of payment for future utility services; (b) prohibiting utility companies from altering, refusing, or discontinuing services; (c) establishing procedures for determining adequate assurance of payment; (d) authorizing fee payments to Ecova for services performed; (e) requiring utility providers to return deposits for utility services no longer in use; and (f) granting related relief.

41.     In connection with the operation of their business and management of their properties, the Debtors obtain water, sewer service, electricity, waste disposal, natural gas, and other similar services ("Utility Services") either directly from utility companies or their brokers or indirectly from landlords that pay for and pass through the costs associated therewith to the Debtors in accordance with the applicable nonresidential real property lease ("Utility Providers"). The relief requested herein applies to all Utility Providers.

42.     The Debtors manage most payments for Utility Services through Ecova, Inc. ("Ecova") pursuant to a Service Agreement. On average, the Debtors pay approximately $694,700 each month for third-party Utility Services, calculated as a historical average payment for the twelve-month period ending October 31, 2017, and including the monthly fee to Ecova. However,

Utility Services billed directly to the Debtors' landlords are not included in the historical average payment amount stated above.

43.     Over the next 30 days, the Debtors estimate that their cost for Utility Services (not including any deposits or fees paid to Ecova) will be approximately $646,700.  The Debtors propose depositing $343,087.29 into a segregated account as additional assurance of payment (the "Adequate Assurance Deposit"), which is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment.  The Adequate Assurance Deposit will be held at Wells Fargo Bank, N.A., and the Debtors' creditors will have no lien on any Adequate Assurance Deposit.

44.     The Debtors are conducting store closing sales for certain retail locations, which are expected to be completed on or before December 31, 2017.  After these stores are closed and utility accounts associated therewith are settled, the Debtors will reduce the amount of the Adequate Assurance Deposit to reflect Utility Services that are no longer being provided.  The applicable Utility Providers will be required to return deposits within 21 days of receiving notice from the Debtors that the respective Utility Service is no longer in use.

45.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient.  This ensures that all key stakeholder groups obtain notice of such request before it is honored.

46.     Furthermore, the Debtors request that Utility Providers be prohibited from refusing or disrupting Utility Services, for any duration, including those that are indirectly obtained through nonresidential real property leases with landlords associated with certain retail locations.

Landlords must continue to honor their obligations and pay for Utility Services in accordance with such leases until the applicable lease is rejected pursuant to section 365 of the Bankruptcy Code, notwithstanding any current or future nonpayment, deferral, waiver, or other compromise of rent. Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and a successful reorganization. The Debtors' retail enterprise requires maintaining open and active stores to entice and allow customers to make purchases. Any disruption would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits. This, in turn, jeopardizes the value of the Debtors' estates and impact creditor recoveries. Therefore, it is critical that Utility Services continue uninterrupted during these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

IX.   **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

47.     The Debtors request authority to: (a) negotiate, remit and pay certain accrued and outstanding prepetition obligations accrued in the ordinary course of business on account of the Taxes and Fees (as defined herein) in an aggregate amount not to exceed $4,660,100 on an interim basis and $10,952,000 on a final basis, absent further order of the Court; and (b) continue negotiating and paying the Taxes and Fees accrued in the ordinary course of business on a postpetition basis.

48.     In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various governmental authorities. The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases. Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the

Debtors' estate because the governmental authorities could file liens or seek to lift the automatic stay.

49.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**X.      Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Maintain the Customs Surety Bonds, and (E) Honor the Terms of the Financing Agreement and Pay Premiums Thereunder, and (II) Granting Related Relief (the "Insurance Motion").**

50.     The Debtors request authority to: (i) continue honoring their obligations under insurance policies entered into prepetition (the "Insurance Policies") and satisfy payment of prepetition obligations related thereto, including the payment of related brokerage fees, (ii)  renew, supplement, modify, extend or purchase insurance coverage in the ordinary course of business on a postpetition basis, (iii) maintain the surety bonds provided to the U.S. Customs and Border Protection Agency ("U.S. Customs") (the "Customs Surety Bonds"), and (iv) honor the terms of the financing agreement that the Debtors use to finance some Insurance Policies (the "Financing Agreement"), and pay premiums thereunder; all in an aggregate amount not to exceed $230,000 on an interim basis and $550,000 on a final basis, absent further order of the Court.

51.     The Debtors' Insurance Policies and Customs Surety Bonds are essential to the preservation of the value of the Debtors' business, properties, and assets.  I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.  Failure to make the payments required by the Debtors'

Insurance Policies, including the Financing Agreement, could have a significant negative impact on the Debtors' operations.

52.     Similarly, the Debtors are required by U.S. Customs to provide the Customs Surety Bonds in order to be able to import merchandise into the United States.  Given that the Debtors rely on imported merchandise to replenish their inventory and invigorate their operations, failure to provide, maintain, or timely replace the Customs Surety Bonds will jeopardize the Debtors ability to operate their businesses.

53.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**XI.     Debtors' Application For Entry of an Order (I) Authorizing and Approving the Appointment of Rust Consulting/Omni  Bankruptcy As Claims and Noticing Agent and (Ii) Granting Related Relief (the "Omni 156(c) Retention Application").**

54.     Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order (a) appointing Rust Consulting/Omni Bankruptcy ("Omni") as claims and noticing agent for the Debtors and their chapter 11 cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases, and (b) granting related relief.

55.     Based on my discussions with the Debtors' advisors, I believe that the Debtors'
selection of Omni to act as the Claims and Noticing Agent is appropriate under the circumstances
and in the best interest of the estates.   Moreover, it is my understanding that based on all
engagement proposals obtained and reviewed that Omni's rates are competitive and comparable
to the rates charged by their competitors for similar services.

56.     The Debtors anticipate that there will be thousands of persons and entities to be
noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity
of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent
will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's
office of the administrative burden of, noticing and processing proofs of claim and is in the best
interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I
respectfully submit that the Court should approve the Omni 156(c) Retention Application.

**XII.    Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing (A) the
Rejection of Certain Unexpired Leases and (B) the Abandonment of Certain Personal
Property, Each Effective *Nunc Pro Tunc* to December 31, 2017, and (II) Granting
Related Relief (the "Lease Rejection Motion").**

57.     Pursuant to the Lease Rejection Motion the Debtors seek entry of an order
authorizing the rejection of certain unexpired leases for nonresidential real property and
authorizing the abandonment of certain equipment, fixtures, furniture, or other personal property
that may be located at the Premises.

58.     The Debtors anticipate that as of December 31, 2017 (or December 14, 2017 for one
of the Leases), the Debtors will have ceased operations at 97 brick-and-mortar retail locations,
vacated the Premises, and delivered possession and the keys to the respective landlords of the
Premises. The Debtors will notify, on or before December 31, 2017 (or December 14, 2017 for
one of the Leases), each affected landlord in writing of the Debtors' unequivocal and irrevocable

decision to surrender the Premises and abandon possession to each applicable landlord and to reject each applicable Lease.  To preserve value for their estates by avoiding unnecessary rent costs the Debtors seek to reject the Leases—which are comprised of all of the nonresidential real property leases for the stores in which the Debtors formerly operated.

59.    Absent rejection, the Debtors would be obligated to pay rent under the Leases even though they have ceased operations at, and are no longer in possession of, such former store locations.  Moreover, in addition to their obligations to pay rent under the Leases, the Debtors would be obligated to pay certain real property taxes, utilities, insurance, and other related charges associated with certain of the Leases.  The Debtors have determined in their business judgment that continuing to pay rent on the Leases to be rejected constitutes a waste of estate assets, and the Debtors have determined in their business judgment that the costs of the Leases exceed any marginal benefits that could potentially be achieved from assignments or subleases of the Leases.

60.    The Debtors believe they will save approximately $1.7 million per month in rent and associated costs if they can reject the Leases *nunc pro tunc* to December 31, 2017 (or December 14, 2017 for one of the Leases).  I believe that the Leases to be rejected provide no benefit to the Debtors' estates or these chapter 11 cases, and by rejecting such Leases, the Debtors will avoid unnecessary rent costs.  Therefore, this Court should grant the Debtors' Lease Rejection Motion.

**XIII.  Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief (the "Contract/Lease Rejection Procedures Motion").**

61.    Pursuant to the Contract/Lease Rejection Procedures Motion, the Debtors seek entry of an order authorizing and approving procedures for rejecting or assuming executory contracts and unexpired leases.

62.     The Debtors are in the process of evaluating all of their Contracts to determine whether such Contracts should be (a) rejected as unfavorable to the Debtors, or (b) assumed or assumed and assigned, including those Contracts to be assumed as amended through consensual negotiations with the relevant counterparties.  Pursuant to the Store Closing Motion, the Debtors are separately seeking the authority to liquidate the inventory contained in and wind down certain of the Debtors' retail store locations.

63.     Absent the relief requested in this Motion, the Debtors would be required to file separate motions to assume or reject the Contracts, resulting in substantial costs to, and administrative burdens on, the Debtors' estates—in addition to burdening the Court's docket.

64.     I believe that the Contract Procedures provide the best and most efficient means of rejecting and assuming executory contracts and unexpired leases, and such procedures will allow the Debtors to focus their attention on maximizing the value of the Debtors' estates and avoid unnecessary costs that would be incurred from filing separate motions to assume or reject leases. Therefore, the Court should grant the Debtors' Contract/Lease Rejection Procedures Motion.

# **EXHIBIT B**

## **Corporate and Capital Structure**

# Charming Charlie
## Corporate and Capital Structure



**Charming Charlie Holdings Inc.**
(Delaware)

**Charming Charlie International LLC** (Delaware)

**Charming Charlie USA, Inc.** (Utah)

**Charming Charlie LLC** (Delaware)

Charming Charlie Global UK Limited

**Charming Charlie Canada LLC** (Delaware)

**Poseidon Partners CMS, Inc.** (Delaware)

**Charming Charlie Manhattan LLC** (Delaware)

Charming Charlie Global FZE (Dubai)

Charming Charlie Logistics (China Business Trust) CC Global FZE, Trustee Chinese CFC

Charming Charlie Global [2] (Cayman Islands)

Charming Charlie Global Beneficiary One (Cayman Islands)

Charming Charlie Global Beneficiary Two (Cayman Islands)

Charming Charlie Global (Shanghai) Trading (Chinese WFOE)

### Capital Structure Summary[3]

| Funded Debt | Amount Outstanding (in millions) |
|---|---|
| $150MM Sr. Sec. Term Loan ("TL") due Dec. 2019 | $132.0 |
| • (rate: L + 8.00% OR Base Rate + 7.00%) | |
| $55MM ABL Revolver ("ABL") due Jun. 2020[1] | $22.0 |
| • (rate: L + 2.25 – 2.50% OR Prime Rate + 1.25 – 1.50%) | |
| **Total Outstanding Funded Debt: $154.0** | |

| Preferred Stock | Amount (in millions) |
|---|---|
| Series T Preferred Stock | $85.7 |
| Junior Preferred Stock | $10.4 |
| **Value of Total Preferred Stock: $96.1** | |

**Key**

- Borrower under the ABL
- Borrower under the TL
- Guarantor under the ABL
- Guarantor under the TL
- Debtor Entities
- Non-Debtor Entities

**Notes**
1. ABL maturity of June 2020 springs to November 2019 (*i.e.*, 45 days before maturity of TL) if the TL is not repaid or refinanced prior to that date
2. Merged into Charming Charlie Global UK Limited for tax purposes
3. Charming Charlie's Capital structure also includes Capital Leases in the aggregate amount of $235,651
4. The equity ownership of each entity is 100% held by its immediate parent

*charming charlie*

# **EXHIBIT C**

**Restructuring Support Agreement and Term Sheet**

*Execution Version*

# PLAN SUPPORT AGREEMENT

This **PLAN SUPPORT AGREEMENT** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of December 11, 2017, is entered into by and among the following parties:

(i) Charming Charlie Holdings Inc. ("***HoldCo***") on behalf of itself and certain of its subsidiaries listed on the signature page attached hereto (collectively, the "***Company***");

(ii) (a) TSG Consumer Partners and Hancock Park Associates, each on behalf of itself and each of its affiliated investment funds or investment vehicles managed or advised by it, and its affiliated persons and entities that directly or indirectly hold interests in the Company, and (b) Charles J. Chanaratsopon, on behalf of himself and each of its affiliated investment funds, investment vehicles, or trusts managed or advised by him that directly or indirectly hold interests in the Company (collectively, the "***Owners***"); and

(iii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders, of Term Loan Claims (as defined below) (together with their respective successors and permitted assigns and any subsequent holder of Term Loan Claims that becomes party hereto in accordance with the terms hereof, collectively, the "***Consenting Lenders***", and the ad hoc committee of Consenting Lenders that is represented by, *inter alia*, Paul, Weiss, Rifkind, Wharton & Garrison LLP and FTI Consulting the "***Consenting Term Loan Committee***").

The Company, each Consenting Lender, the Owners, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***."  Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the term sheet attached hereto as Exhibit A (as may be amended from time to time in accordance with this Agreement and the Definitive Documents (as defined below), the "***Term Sheet***").

**WHEREAS**, the Parties and their respective professionals have negotiated in good faith and at arm's length and have agreed to a restructuring of the Company (the "***Restructuring***" and the transactions contemplated therein, the "***Restructuring Transactions***") that will be implemented and consummated pursuant to a chapter 11 plan of reorganization (as may be modified in accordance with Section 11 hereof and on terms consistent with those set forth in this Agreement, the Term Sheet, and the Definitive Documents, the "***Plan***") in cases commenced under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

**WHEREAS,** the Restructuring will be consummated in accordance with the terms of this Agreement and the Term Sheet, and the Term Sheet is the product of arm's length, good faith discussions between the Parties and their respective professionals;

**WHEREAS**, in connection with the Restructuring, the Owners have agreed during the Plan Support Period to refrain from pledging, encumbering, assigning, selling, or otherwise Transferring any Debtor Interests, to the extent and on the terms set forth herein;

**WHEREAS,** as of the date hereof, the Consenting Lenders hold, in the aggregate, (i) approximately 88% of the aggregate outstanding principal amount of the loans and other obligations relating to the amended and restated term loan and guarantee agreement, dated as of July 7, 2017, among HoldCo, the subsidiary Company guarantors party thereto, Morgan Stanley Senior Funding, Inc., as administrative agent, and the lenders party thereto (as amended, modified, or otherwise supplemented from time to time prior to the date hereof, the "***Term Loan Agreement***," and the claims and other obligations arising under the Term Loan Agreement, the "***Term Loan Claims***")

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters related to the Plan and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.    Certain Definitions.

Additionally, as used in this Agreement, the following terms have the following meanings:

(a)      "Effective Date" means the effective date of the Plan.

(b)      "Plan Support Effective Date" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) holders of at least 66 2/3% of the outstanding principal amount of the Term Loan Claims, and (iii) the Owners.

(c)      "Plan Support Period" means the period commencing on the Plan Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 7  hereof and (ii) the Effective Date.

(d)      "Requisite First Lien Lenders" means, as of the date of determination, Consenting Lenders that are members of the Consenting Term Loan Committee holding at least a majority of the aggregate outstanding principal amount of the Term Loan Claims held by all of the Consenting Lenders that are members of the Consenting Term Loan Committee as of such date.

(e)      "Tax" or "Taxes" means any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under §59A of the Internal Revenue Code of 1986, as amended), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, and including any liability under Treasury Regulation § 1.1502-6 or any analogous or similar state, local or non-U.S. law or regulation.

2

2.      **Definitive Documents**.

(a)      The definitive documents (in each case, as amended, modified or otherwise supplemented from time to time during the Plan Support Period, the "***Definitive Documents***") with respect to the Restructuring shall include all documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Plan and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring, including, without limitation: (i) the Plan; (ii) the documents to be filed in the supplement to the Plan (collectively, the "***Plan Supplement***"); (iii) the disclosure statement for the Plan that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code (the "***Disclosure Statement***"); (iv) the motion seeking approval of the Disclosure Statement (the "***Disclosure Statement Motion***") and the order approving the Disclosure Statement (the "***Disclosure Statement Order***"); (v) the order confirming the Plan (the "***Confirmation Order***"); (vi) the motions seeking approval of any "first-day" relief requested by the Company and any orders in connection therewith; (vii) the motion seeking approval of the Company's incurrence of postpetition debt financing provided by, *inter alia*, certain members of the Consenting Term Loan Committee (the "***Term Loan DIP Motion***") and the credit agreement with respect thereto (the "***Term Loan DIP Credit Agreement***"); (viii) the order approving the Company's incurrence of postpetition financing pursuant to the Term Loan DIP Credit Agreement on an interim basis (the "***Interim DIP Order***"); (ix) the order approving the Company's incurrence of postpetition financing pursuant to the Term Loan DIP Credit Agreement on a final basis (the "***Final DIP Order***", and together with the Interim DIP Order, the "***DIP Orders***"); (x) the credit agreement with respect to any exit facilities; (xi) the credit agreement or similar debt documents with respect to the New Term Loan Facility (as defined in the Term Sheet), and any agreements, documents, or instruments related thereto; and (xii) any organizational documents, shareholder and member related agreements or other governance documents for the reorganized Company.  During the Plan Support Period, each of the Definitive Documents and any modifications, amendments, or supplements thereto (1) shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet, (2) shall otherwise be reasonably satisfactory in all respects to the Company and the Requisite First Lien Lenders in all respects, and (3) shall otherwise be reasonably satisfactory to the Owners to the extent the provisions thereof affect the legal and/or economic rights of the Owners.

3.      **Agreements of the Consenting Lenders.**  During the Plan Support Period, subject to the terms and conditions hereof, each Consenting Lender agrees, solely with respect to itself, that:

(a)      it will use its commercially reasonable efforts to support the Restructuring and the transactions contemplated by this Agreement and the Term Sheet, as applicable, and to act in good faith and take all reasonable actions necessary to consummate the Restructuring and the transactions contemplated by this Agreement, the Term Sheet and the Definitive Documents, in a manner consistent with this Agreement, including the timelines set forth herein;

(b)      solely if it is a lender providing financing under the Term Loan DIP Credit Agreement, and not with respect to any other Party hereto, subject to the terms and conditions of this Agreement and the Term Loan DIP Credit Agreement, it will execute and, subject to entry of

the DIP Orders, consummate the transactions contemplated by the Term Loan DIP Credit Agreement in accordance with <u>Section 2</u> hereof and the Term Loan DIP Credit Agreement;

(c)     it shall not (A) direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Consenting Lender's obligations under this Agreement, and, if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with such Consenting Lender's obligations under this Agreement, such Consenting Lender shall use its commercially reasonable efforts to request that such administrative agent, collateral agent, or indenture trustee to cease and refrain from taking any such action (but shall not be required to sue any person or entity or incur any indemnification obligations in respect of such request or otherwise), or (B) directly or indirectly, or encourage any other person or entity to directly or indirectly, (x) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement) of the Plan; (y) propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Company  that is inconsistent with this Agreement or the Term Sheet; or (z) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company or any direct or indirect subsidiaries of the Company that do not file for chapter 11 under the Bankruptcy Code except in a manner consistent with this Agreement, the DIP Orders, and the Term Loan DIP Credit Agreement, as applicable;

(d)     subject to the receipt of the Disclosure Statement pursuant to the Disclosure Statement Order, it shall (A) timely vote or cause to be voted any Debtor Claims/Interests (as defined herein) it holds that are subject to this Agreement to accept the Plan (to the extent permitted to vote) by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125(g) and 1126 of the Bankruptcy Code, (B) not change or withdraw such vote or the elections described below (or cause or direct such vote or elections to be changed or withdrawn); <u>provided</u>, <u>however</u>, that such vote or elections may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Lender at any time following the expiration of the Plan Support Period, and (C) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not elect to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot or ballots indicating such election;

(e)     support and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the solicitation of votes on the Plan, approval of the Disclosure Statement, and confirmation and consummation of the Plan (it being understood that the Consenting Lenders shall not be required to incur any material costs, expense or liability in connection therewith); and

(f)     not assert any claims of any kind against the Owners in connection with the Chapter 11 Cases.

Notwithstanding anything to the contrary contained herein, except as expressly set forth herein or in the Definitive Documents, no Consenting Lender shall be required to incur, assume, become

liable in respect of, or suffer to exist any material expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in material expenses, liabilities or other obligations to such Consenting Lender.

4.    **Agreements of the Owners.**  During the Plan Support Period, subject to the terms and conditions hereof, each of the Owner agrees, solely with respect to itself, that:

(a)    it will use its commercially reasonable efforts to support the Restructuring and the transactions contemplated by this Agreement and the Term Sheet, as applicable, and to act in good faith and take all reasonable actions necessary to consummate the Restructuring and the transactions contemplated by this Agreement, the Term Sheet and the Definitive Documents, in a manner consistent with this Agreement, including the timelines set forth herein;

(b)    it shall not (A) directly or indirectly, or encourage any other person or entity to directly or indirectly, (x) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement) of the Plan; (y) propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Company  that is inconsistent with this Agreement or the Term Sheet; or (z) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company or any direct or indirect subsidiaries of the Company that do not file for chapter 11 under the Bankruptcy Code except in a manner consistent with this Agreement;

(c)    subject to the receipt of the Disclosure Statement pursuant to the Disclosure Statement Order, it shall (A) timely vote or cause to be voted any Debtor Claims/Interests it holds that are subject to this Agreement to accept the Plan (to the extent permitted to vote) by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125(g) and 1126 of the Bankruptcy Code, (B) not change or withdraw such vote or the elections described below (or cause or direct such vote or elections to be changed or withdrawn); provided, however, that such vote or elections may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Owner at any time following the expiration of the Plan Support Period, and (C) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not elect to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot or ballots indicating such election;

(d)    support and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the solicitation of votes on the Plan, approval of the Disclosure Statement, and confirmation and consummation of the Plan (it being understood that the Owners shall not be required to incur any material costs, expense or liability in connection therewith);

(e)    not pledge, encumber, assign, sell or otherwise transfer, offer or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its Debtor Claims/Interests; *provided*, that nothing in this Agreement shall prohibit any Owner from utilizing its worthless stock deduction in accordance with the following procedures: (i) by the earlier of January 31, 2018 or the date that is twenty business days before the start of the hearing to consider confirmation of the Plan (the "Owner Notice Date"), the Company will provide a notice to each Owner stating whether the Company, in consultation with the Requisite First Lien Lenders, has determined (a "Material Impact Determination") that such Owner's utilization of its worthless stock deduction with respect to the tax year ending December 31, 2017 would materially adversely affect the Company's ability to utilize tax attributes that will remain available following the effective date of the Plan ("Post-Effective Date Tax Attributes"), if any, which notice shall be accompanied by reasonably detailed documentation and analysis, including, without limitation, a good-faith estimate of the value of any Post-Effective Date Tax Attributes and the Company's projected post-effective date income; and (ii) if any Owner with respect to which a Material Impact Determination has been made (each, a "Specified Owner"), the Company, and the Requisite First Lien Lenders do not reach agreement as to the permissibility of such Specified Owner taking the worthless stock deduction with respect to the tax year ending December 31, 2017 (such agreement to be satisfactory to such Specified Owner, the Company and Requisite First Lien Lenders), then (A) such Specified Owner may seek relief from the Bankruptcy Court on an expedited basis; (B) the rights of the Company and the Requisite First Lien Lenders with respect to such relief are fully preserved (but no Party to this Agreement shall oppose expedited treatment of such Specified Owner's motion or other pleading for relief); and (C) until such time the Bankruptcy Court enters an order granting such relief, such Specified Owner shall not utilize such worthless stock deduction with respect to the tax year ending December 31, 2017; and *provided, further,* for the avoidance of doubt, that, if the Company fails to give notice to any Owner of a Material Impact Determination by the Owner Notice Date, such Owner shall be free to utilize its worthless stock deduction without further notice to any party;

(f)    not assert any claims of any kind or priority against the Company or any of the Consenting Lenders in the Chapter 11 Cases (provided, that the Owners shall have the right to file a proof of claim or interest in the Chapter 11 Cases in compliance with the bar date to preserve its right to assert its claims or interests solely if this Agreement terminates in accordance with its terms); *provided*, *however*, that, notwithstanding anything contained herein, each Owner shall be entitled to submit or assert any claims of any kind or priority against the Company including filing a proof of claim, for any claim that does not arise directly or indirectly from its ownership of Debtor Interests in the Company; *provided*, *further*, that the rights of all other Parties with respect to such claims, including the right to file objections to such claims, shall not be impaired, modified, or affected by the terms of this Agreement.

(g)    not take any action, or cause any Company entity or any Affiliate of any Company entity to take any action, that would generate taxable income for the Company or any Affiliate of any Company outside the ordinary course of business of the Company, or cause any Affiliate of any Company to cease to be a member of an existing consolidated group, if any; and

(h)    cooperate (and cause any Affiliates of any Company entity over which it has control to cooperate) with the Company and any successors thereto in connection with any

consolidated group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the consent of the Company or their successors thereto, such consent not to be unreasonably withheld).

(i)     Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by the Owner nor the acceptance of the Plan by the Owners (x) shall be construed to prohibit or limit the Owner from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Plan Support Period, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions or (y) shall restrict or limit affiliated persons of the Owners that are officers or directors of the Company from taking any action or refraining from taking any action consistent with their fiduciary duties.

## 5.    Agreements of the Company.

(a)     During the Plan Support Period, subject to the terms and conditions hereof, the Company agrees that it shall, and shall cause each of its subsidiaries included in the definition of Company to, without limitation:

(i)     (A)(1) commence the Chapter 11 Cases on or before 11:59 p.m. Eastern Time on December 15, 2017 (as such date may be extended with the consent of the Requisite First Lien Lenders, the "*Outside Petition Date*," and the actual commencement date, the "*Petition Date*"), (2) complete and file, within the timeframes contemplated herein, the Plan, Disclosure Statement and the other Definitive Documents, and (3) use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Disclosure Statement Order and Confirmation Order within the timeframes contemplated by this Agreement; and (B) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan, if any;

(ii)     continue to operate its businesses in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (i) resulting from or relating to the filing or prosecution of the Chapter 11 Cases or (ii) imposed by the Bankruptcy Court), and confer with the Requisite First Lien Lenders and their respective representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations.  Notwithstanding the generality of the foregoing, the Company shall, except as expressly contemplated by this Agreement or with the prior written consent of the Requisite First Lien Lenders and, subject to applicable bankruptcy law, use commercially reasonable efforts consistent with the Restructuring to (A) continue to operate its businesses in compliance with all applicable laws, rules and regulations in all material respects, (B) maintain its physical assets, properties and facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (C) perform all obligations required to be performed by the Company under any executory contracts or unexpired leases that have not been rejected by order of the Bankruptcy Court, (D) maintain its books and records on a basis consistent with prior practice, (E) bill for products sold or services rendered and pay accounts payable in a manner generally consistent with past practice, but taking into account the

7

Restructuring, (F) maintain all insurance policies, or suitable replacements therefor, in full force and effect through the close of business on the Effective Date, (G) provide the Requisite First Lien Lenders with updated financial information concerning the Company upon reasonable request, (H) neither encumber nor enter into any material new leases, licenses or other use or occupancy agreements for real property or any part thereof, (I) timely pay any and all required fees and taxes with respect to patents (if any), patent applications (if any), any trademark applications and any registered trademarks,  and (J) not enter into any collective bargaining agreement, works council or similar agreement with any labor union or labor organization representing employees of the Company, except as a result of an automatic renewal or annual rate modifications or as required by applicable law or existing contract;

(iii)    (A) support and take all reasonable actions necessary or reasonably requested by the Requisite First Lien Lenders to facilitate the solicitation, confirmation and consummation of the Restructuring, the Definitive Documents and the transactions contemplated thereby, and (B) not take any action directly or indirectly that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan and the Restructuring, including soliciting or causing or allowing any of its agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other than the Restructuring (an "*Alternative Transaction*"), and (C) not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement, the Term Sheet or the Definitive Documents or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Restructuring.

(iv)    (A) file on the Petition Date such first-day motions and pleadings that are reasonably acceptable, in form and substance, to the Requisite First Lenders;

(B) (i) file the Plan, the Disclosure Statement (other than any exhibits attached thereto), and the Disclosure Statement Motion with the Bankruptcy Court within ten (10) business days of the Petition Date; (ii) obtain approval of the Disclosure Statement Motion within fifty (50) business days of the Petition Date, and (iii) obtain entry of the Confirmation Order within seventy-nine (79) business days of the Petition Date (such date that the Confirmation Order is entered, the "*Confirmation Date*");

(C) cause the Confirmation Order to become effective and enforceable immediately upon its entry and to have the period in which an appeal thereto must be filed commence immediately upon its entry;

(v)    pay all prepetition and postpetition reasonable and documented fees and expenses of the Consenting Term Loan Committee and their advisors (subject to the terms of the applicable executed engagement letters), including, without limitation, the fees and expenses of (1) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as co-counsel to the Consenting Term Loan Committee, (2) Young Conaway Stargatt & Taylor, LLP, as co-counsel to the Consenting Term Loan Committee, and (3) FTI Consulting, as financial advisor to the

Consenting Term Loan Committee, *provided*, *however*, that the Company shall not be responsible under this Agreement for any fees or expenses incurred after termination of this Agreement.

(vi)      provide draft copies of all Definitive Documents (and any amendments, modifications or supplements thereto), and all material motions or applications and other documents the Company intends to file with the Bankruptcy Court, to counsel to the Consenting Term Loan Committee at least three (3) days prior to the date when the Company intends to file such document (and make reasonable best efforts to provide such draft copies three (3) business days before the intended filing date) and consult in good faith with such parties regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(vii)     maintain their good standing under the laws of the state in which they are incorporated or organized;

(viii)    timely file with the Bankruptcy Court (A) a formal written response in opposition to any objection filed with the Bankruptcy Court by any person with respect entry of the DIP Orders, the Disclosure Statement Order or the Confirmation Order or any relief related thereto, and (B) a formal written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (I) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (II) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (III) dismissing any of the Chapter 11 Cases or (IV) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(ix)      provide to the Requisite First Lien Lenders and/or their respective professionals, upon reasonable advance notice to the Company, (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records and facilities, (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring and (C) prompt access to any information provided to any existing or prospective financing sources (including lenders under any exit financing);

(x)       use commercially reasonable efforts to preserve intact in all material respects their current business organizations, keep available the services of their current officers and material employees (in each case, other than voluntary resignations, terminations for cause or terminations consistent with applicable fiduciary duties) and preserve in all material respects their relationships with customers, sales representatives, suppliers, distributors and others, in each case, having material business dealings with the Company (other than terminations for cause or consistent with applicable fiduciary duties);

(xi)      provide prompt written notice (in any event which notice shall be provided within 48 hours after any Company entity has actual knowledge of the circumstance giving rise to the notice obligation set forth in this <u>clause (xi)</u>) to the Requisite First Lien Lenders between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely

to cause (1) any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate in any material respect, (2) any covenant of the Company contained in this Agreement not to be satisfied in any material respect or (3) any condition precedent contained in the Plan or this Agreement not to occur or become incapable of being satisfied, (B) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any written notice from any governmental body in connection with this Agreement or the transactions contemplated by the Restructuring, (D) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring, and (E) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

(xii)    promptly notify the other Parties in writing (in any event which notice shall be provided within 48 hours after any Company entity has actual knowledge of the circumstance giving rise to the notice obligation set forth in this clause(xii)) following the receipt, in writing, of notice of any material governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened);

(b)    <u>Negative Covenants</u>.  The Company agrees that, for the duration of the Plan Support Period, the Company shall not take any action inconsistent with, or omit to take any action required by, this Agreement, the Plan, or any of the other Definitive Documents, *provided*, *however*, that the officers and employees of each Company entity shall not be required to take (or refrain from taking) any actions inconsistent with applicable law.

(c)    <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice).

## 6.    <u>Transfer of Debtor Claims / Interests.</u>

(a)    <u>Transfers</u>.  During the Plan Support Period, subject to the terms and conditions hereof, each Consenting Lender agrees, solely with respect to itself, that it shall not sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a "***Transfer***") any ownership (including any beneficial ownership)[1] in any claims against or interests in the Company (such claims, "***Debtor Claims***," such interests, "***Debtor Interests***," and together with Debtor Claims, the "***Debtor Claims/Interests***")), as applicable, or any option thereon or any right or interest therein (including by granting any proxies or depositing any interests in the Debtor Claims/Interests into a voting trust or by entering into a voting agreement

---

[1]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims/Interests or the right to acquire such Debtor Claims/Interests.

with respect to the Debtor Claims/Interests), unless the intended transferee (A) is a Consenting Lender or (B) executes and delivers to counsel to the Company on the terms set forth below an executed form of the transfer agreement in the form attached hereto as **Exhibit B** (a "*Transfer Agreement*") before such Transfer is effective (it being understood that any Transfer shall not be effective as against the Company until notification of such Transfer and a copy of the executed Transfer Agreement is received by counsel to the Company, in each case on the terms set forth herein) (such transfer, a "*Permitted Transfer*" and such party to such Permitted Transfer, a "*Permitted Transferee*").

(b)     Owner Transfers.  Notwithstanding anything to the contrary contained herein, during the Plan Support Period, each Owner agrees, solely with respect to itself, that it shall not, directly or indirectly, Transfer any of its Debtor Claims/Interests except to another Owner, and any other purported Transfer of Debtors Claims/Interests shall be null and void and without effect.

(c)     Notwithstanding anything to the contrary herein, (i) the foregoing provisions shall not preclude any Consenting Lender or Owner from settling or delivering any Debtor Claims/Interests Claims to settle any confirmed transaction pending as of the date of such Consenting Lender's or Owner's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Debtor Claims/Interests so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement), (ii) a Qualified Marketmaker[2] that acquires any Debtor Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Debtor Claims/Interests, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Debtor Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within ten (10) business days of its acquisition to a Consenting Lender, Owner, or Permitted Transferee and the transfer otherwise is a Permitted Transfer, (iii) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Debtor Claims/Interests that it acquires from a holder of Debtor Claims/Interests that is not a Consenting Lender or Owner to a transferee that is not a Consenting Lender or Owner at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Transfer Agreement, and (iv) any Consenting Lender shall be permitted to pledge or grant a security interest in all or any portion of such Consenting Lender's rights hereunder including, but not limited to, any loans, to secure the obligations of such Consenting Lender or any of its affiliates to any person providing any loan, letter of credit or other extension of credit to or for the account of such Consenting Lender or any of its affiliates and any agent, trustee or representative of such person.

---

[2]     As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(d)     With respect to the Transfer of any Debtor Interests, such Transfer shall not (A) violate the terms of any order entered by the Bankruptcy Court with respect to preservation of net operating losses or (B) in the reasonable business judgment of the Company and their legal and tax advisors, adversely (1) affect the Company's ability to maintain the value of and utilize their net operating loss carryforwards or other tax attributes or (2) the Company's ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring Transaction.

(e)     This Agreement shall in no way be construed to preclude the Consenting Lenders or Owners from acquiring additional Debtor Claims/Interests; provided, however, that (a) any Consenting Lender or Owner that acquires additional Debtor Claims/Interests during the Plan Support Period shall promptly notify the Company, counsel to the Consenting Term Loan Committee, and counsel to the Owners of such acquisition, including the amount of such acquisition and (b) such acquired Debtor Claims/Interests shall automatically and immediately upon acquisition by a Consenting Lender or Owner be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Company), in the case of each of clauses (a) and (b), other than with respect to any Debtor Claims/Interests acquired by such Consenting Lender or Owner in its capacity as a Qualified Marketmaker, in accordance with this Section 6.

(f)     This Section 6(f) shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Lender or Owner to Transfer any Debtor Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information (each such executed agreement, a "*Confidentiality Agreement*"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

(g)     Any Transfer made in violation of this Section 6 shall be void *ab initio*.

**7.     Termination of Agreement.**

(a)     Automatic Termination.  This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of any of the following events: (i) entry of an order denying confirmation of the Plan, (ii) the occurrence of the Effective Date, (iii) an order confirming the Plan is reversed or vacated, or (iv) any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

(b)     Consenting Lender Termination Events. This Agreement may be terminated by the Requisite First Lien Lenders by the delivery to the Company, the Owners, and counsel to the other Consenting Lenders (if separate), other than the Consenting Lenders seeking to terminate this Agreement pursuant to this Section 7(b) of a written notice in accordance with Section 21 hereof, upon the occurrence of any of the following events, subject to the existence of any cure periods set forth in this Section 7(b):

(i)      as of 11:59 p.m. Eastern Time on the Outside Petition Date, as such date may be extended with the prior written consent of Requisite First Lien Lenders, if the Chapter 11 Cases shall not have been filed by such time;

(ii)      the Company fails to file the Plan, the Disclosure Statement, and the  Disclosure Statement Motion on or before the date that is ten (10) business days after the Petition Date;

(iii)      the Bankruptcy Court (A) denies approval of the Disclosure Statement Motion or (B) fails to enter the Disclosure Statement Order, within fifty (50) business days after the Petition Date;

(iv)      the Bankruptcy Court fails to enter the Confirmation Order within seventy-nine (79) business days after the Petition Date;

(v)      the breach by the Company or any Owner of (a) any affirmative or negative covenant of such Party contained in this Agreement or (b) any other obligations of such Party set forth in this Agreement, in each case, in any material respect (without giving effect to any "materiality" qualifiers set forth therein), and which breach remains uncured for a period of five (5) business days following the receipt of notice by such breaching Party pursuant to Section 21 hereof (as applicable);

(vi)      any representation or warranty in this Agreement made by the Company or any Owner shall have been untrue in any material respect when made or shall have become untrue in any material respect;

(vii)      the Company or any Owner files any motion, pleading, or related document with the Bankruptcy Court in a manner that is materially inconsistent with this Agreement, the Term Sheet or the Definitive Documents, or is adverse to the legal or economic rights of the Requisite First Lien Lenders, and such motion, pleading, or related document has not been withdrawn after three (3) business days of the Company receiving written notice in accordance with Section 21 that such motion, pleading, or related document is materially inconsistent with this Agreement, the Term Sheet or the Definitive Documents;

(viii)      (A) the Bankruptcy Court does not enter the Interim DIP Order on or before the date that is five (5) business days after the Petition Date, (B) the Bankruptcy Court does not enter the Final DIP Order on or before the date that is thirty-five (35) business days after the Petition Date, or (C) the termination of either the Interim DIP Order or the Final DIP Order without the consent of the Requisite First Lien Lenders;

(ix)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order restricting, preventing, prohibiting or enjoining the consummation of or rendering illegal the Plan or the Restructuring or any material portion thereof, or materially impacting the legal or economic rights of the Requisite First Lien Lenders, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been reversed or vacated within thirty (30) business days after such issuance;

13

(x)    any of the Definitive Documents, any amendments, modifications, or supplements thereto, or any related order entered by the Bankruptcy Court is not in form and substance as provided in Section 2 or shall have been vacated, abrogated, terminated, or otherwise is not in full force and effect in each case except to the extent otherwise permitted by Section 2 and Section 11 hereof;

(xi)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) invaliding, disallowing, subordinating, or limiting the enforceability, priority, or validity of any of the Term Loan Claims, or (E) the effect of which would restrict, prevent, prohibit or enjoin the consummation of the Plan or the Restructuring or any material portion thereof on the terms set forth in this Agreement or the Term Sheet or materially impact the legal or economic rights of the Requisite First Lien Lenders;

(xii)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with respect to any assets of the Company having an aggregate fair market value in excess of $15 million without the prior written consent of the Requisite First Lien Lenders;

(xiii)    the Bankruptcy Court or any other court with appropriate jurisdiction enters an order avoiding, invalidating disallowing, subordinating or recharacterizing any Debtor Claims held by any Consenting Lender;

(xiv)    the Company or any Owner files, or supports (or fails to timely object to) another party in filing (A) a motion or pleading challenging the amount, validity or priority of any Term Loan Claims or (B) any plan of reorganization, liquidation, or sale of all or substantially all of the Company's assets other than the Restructuring set forth herein;

(xv)    if the Company (or any Owner, if applicable) (A) withdraws the Plan, (B) publicly announces its intention not to support the Plan or the Restructuring, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction that does not satisfy the Term Loan Claims or DIP Claims in full, in cash, (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or publicly announces its intent to pursue such an Alternative Transaction, or (E) files any motion or pleading in the Chapter 11 Cases that is not consistent in any material respect with the terms and conditions of this Agreement or the Definitive Documents;

(xvi)    the exclusive right of the Company  to file and solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated; or

(xvii)    the Effective Date shall not have occurred on or before the date that is ninety (90) business days after the Petition Date unless such deadline is otherwise extended with the consent of the Requisite First Lien Lenders.

(c)  Company Termination Events. This Agreement may be terminated as between the Company and the other Parties upon five (5) business days written notice delivered in

accordance with <u>Section 21</u> hereof by the Company pursuant to this <u>Section 7(c)</u> upon the occurrence and continuation of any of the following events (provided that the Company has not failed to perform or comply in all material respects with the terms and conditions of this Agreement):

(i)    the breach by one or more of the Consenting Lenders representing in excess of 50.01% of the aggregate principal amount of the Term Loan Claims held by all Consenting Lenders at such time of (a) any affirmative or negative covenant of the Consenting Lenders contained in this Agreement or (b) any other obligations of the Consenting Lenders set forth in this Agreement, in each case, in any material respect (without giving effect to any "materiality" qualifiers set forth therein), and which breach remains uncured for a period of five (5) business days following the receipt of notice by such breaching Consenting Lender(s) pursuant to <u>Section 21</u> hereof (as applicable);

(ii)    any representation or warranty in this Agreement made one or more of the Consenting Lenders representing in excess of 50.01% of the aggregate principal amount of the Term Loan Claims held by all Consenting Lenders at such time shall have been untrue in any material respect when made or shall have become untrue in any material respect;

(iii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order restricting, preventing, prohibiting or enjoining the consummation of or rendering illegal the Plan or the Restructuring or any material portion thereof and such ruling, judgment or order has not been reversed or vacated within thirty (30) business days after such issuance; or

(iv)    the board of directors, managers, or similar governing body, as applicable, of any Company entity determines that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law (as reasonably determined by such Company entity in good faith after consultation with legal counsel).

(d)    <u>Owner Termination Events</u>. Any Owner may terminate its rights and obligations under this Agreement without affecting the other Parties' rights hereunder upon five (5) business days written notice delivered in accordance with <u>Section 21</u> hereof by such Owner pursuant to this <u>Section 7(d)</u> upon the occurrence and continuation of any of the following events (provided that such Owner has not failed to perform or comply in all material respects with the terms and conditions of this Agreement):

(i)    the Bankruptcy Court fails to enter the Confirmation Order within seventy-nine (79) business days after the Petition Date;

(ii)    the breach by one or more of the Consenting Lenders representing in excess of 50.01% of the aggregate principal amount of the Term Loan Claims held by all Consenting Lenders at such time of (a) any affirmative or negative covenant of the Consenting Lenders contained in this Agreement or (b) any other obligations of the Consenting Lenders set forth in this Agreement, in each case, in any material respect (without giving effect to any "materiality" qualifiers set forth therein), and which breach remains uncured for a period of five

(5) business days following the receipt of notice by such breaching Consenting Lender(s) pursuant to Section 21 hereof (as applicable);

(iii) the breach by the Company of (a) any affirmative or negative covenant of the Company contained in this Agreement or (b) any other obligations of the Company set forth in this Agreement, in any material respect (without giving effect to any "materiality" qualifiers set forth therein), and which breach remains uncured for a period of five (5) business days following the receipt of notice by such breaching Party pursuant to Section 21 hereof (as applicable); *provided*, *further*, *however* that the termination right in this clause (iii) shall not be available if any Owner directly or indirectly supported, or encouraged any other entity to directly or indirectly cause such breach;

(iv) any representation or warranty in this Agreement made one or more of the Consenting Lenders representing in excess of 50.01% of the aggregate principal amount of the Term Loan Claims held by all Consenting Lenders at such time shall have been untrue in any material respect when made or shall have become untrue in any material respect;

(v) any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect; *provided*, *further*, *however* that the termination right in this clause (v) shall not be available if any Owner directly or indirectly supported, or encouraged any other entity to directly or indirectly cause such misrepresentation;

(vi) any of the Definitive Documents, any amendments, modifications, or supplements thereto, or any related order entered by the Bankruptcy Court is not in form and substance as provided in Section 2 or shall have been vacated, abrogated, terminated, or otherwise is not in full force and effect in each case except to the extent otherwise permitted by Section 2 and Section 11 hereof; or

(vii) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order restricting, preventing, prohibiting or enjoining the consummation of or rendering illegal  the Plan or the Restructuring or any material portion thereof and such ruling, judgment or order has not been reversed or vacated within thirty (30) business days after such issuance.

(e) <u>Mutual Termination</u>**.**  This Agreement may be terminated by mutual agreement of the Company, the Requisite First Lien Lenders, and the Owners upon the receipt of written notice delivered in accordance with Section 21 hereof.

(f) <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this Section 7 as to a Party, and except as provided in Section 15 hereof, this Agreement shall forthwith become null and void and of no further force or effect as to such Party and such Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; <u>provided</u>, <u>however</u>, that in no

event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. For the avoidance of doubt, any termination of this Agreement pursuant to Sections 7(a), (b), (c), or (e) shall terminate this Agreement with respect to all Parties, and any termination pursuant to Section 7(d) shall only terminate this Agreement with respect to the terminating Owner. Upon any such termination of this Agreement as to a Party in accordance with the terms set forth herein, such Party may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Party, as applicable, prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission).

## 8. Definitive Documents; Good Faith Cooperation; Further Assurances.

Subject to the terms and conditions described herein, during the Plan Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with the negotiation, drafting, execution (to the extent such Party is a party thereto) and delivery of the Definitive Documents. Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings (provided, however, that no Consenting Lender or Owner shall be required to incur any material cost, expense or liability in connection therewith).

## 9. Representations and Warranties.

(a)     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Lender becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)     the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it, its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Lender and Owner severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Lender or Owner becomes a party hereto), such Consenting Lender or Owner, as applicable, (i) is the beneficial owner of the aggregate principal amount of Debtor Claims/Interests set forth below its name on the signature page hereof (or below its name on the signature page of a Transfer Agreement for any Consenting Lender or Owner that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such Debtor Claims/Interests, (A) sole investment or voting discretion with respect to such Term Loan Claims, (B) full power and authority to vote on and consent to matters concerning such Term Loan Claims, or to exchange, assign and transfer such Term Loan Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

## 10.    Disclosure; Publicity.

(a)    On or before the Petition Date, the Company shall disseminate a press release, which shall be in form and substance reasonably acceptable to the Requisite First Lien Lenders, disclosing the existence of this Agreement and the terms hereof and of the Plan (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Petition Date, but subject in all respects to Section 10(b) below) with such redactions as may be reasonably requested by counsel to the Requisite First Lien Lenders to maintain the confidentiality of the items provided below in Section 10(b), except as otherwise required by law.

(b)    Except as required by law or otherwise permitted under the terms of any other agreement between the Company on the one hand, and any Consenting Lender or Owner, on the other hand, no Party or its advisors (including counsel to any Party) shall disclose to any person (including, for the avoidance of doubt, any other Consenting Lender or Owner), other than advisors to the Company, **Exhibit D** or the principal amount or percentage of any Debtor Claims/Interests (including the Consenting Lenders' signature pages to this Agreement) in each case, without such Party's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant disclosing Party) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Term Loan Claims held by all the Consenting Lenders collectively.  Notwithstanding the provisions in this Section 10,

any Party may disclose a Consenting Lender's individual holdings to the extent consented to in writing by such Consenting Lender (including <u>Section 10</u> hereof),.

## 11. Amendments and Waivers.

During the Plan Support Period this Agreement, including any exhibits or schedules hereto may not be waived, modified, amended or supplemented except in a writing signed by the Company, the Owners and the Requisite First Lien Lenders; <u>provided</u>, <u>however</u>, that (a) any modification, amendment, or change to the definition of Requisite First Lien Lenders shall require the prior written consent of each Consenting Lender that is a member of the Consenting Term Loan Committee, and (b) any modification of, or amendment or supplement to this <u>Section 11</u> shall require the written consent of all of the Parties; <u>provided</u> <u>further</u>, <u>however</u>, that any waiver, modification, amendment or supplement that is materially adverse to any Consenting Lender or Owner in a manner that is different or disproportionate in any material respect from the effect on any of the other Consenting Lenders or Owners, as applicable (in their capacity as holders of Debtor Claims/Interests), set forth in this Agreement (other than in proportion to the amount of such Debtor Claims/Interests) shall require the prior written consent of such affected Consenting Lender or Owner, as applicable.

## 12. Effectiveness.

This Agreement shall become effective and binding on the Parties on the Plan Support Effective Date, and not before such date; <u>provided</u>, <u>however</u>, that signature pages executed by Consenting Lenders shall be delivered to (a) counsel to the Consenting Term Loan Committee in an unredacted form (to be held on a confidential basis by such counsel in accordance with <u>Section 10</u> hereof); (b) the Company and its counsel in an unredacted form (to be held on a confidential basis by such counsel in accordance with <u>Section 10</u> hereof); and (c) the Owner and its counsel in an unredacted form (to be held on a confidential basis by such counsel in accordance with <u>Section 10</u> hereof).

## 13. GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflicts of law principles thereof.

(b)     Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties

further waive any argument that such service is insufficient.  Subject to the foregoing, each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 13(b)</u> shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 14.    <u>Specific Performance/Remedies.</u>

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as the sole and exclusive remedy for any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

## 15.    <u>Survival.</u>

Notwithstanding the termination of this Agreement pursuant to <u>Section 7</u> hereof, the agreements and obligations of the Parties set forth in the following Sections:  <u>5(v)</u>, <u>10</u>, <u>12</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, and <u>24</u> (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Lenders in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.     **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.     **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit Transfers of Debtor Claims/Interests, other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, several and neither joint nor joint and several.

18.     **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19.     **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Lender shall continue in full force and effect in accordance with its terms.

20.     **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

21.    **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)    If to the Company, to:

Charming Charlie Holdings Inc.
5999 Savoy Drive
Houston, Texas 77036
Attention: Robert Adamek
(rob.adamek@charmingcharlie.com)
With a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:    Joshua A. Sussberg, P.C., Christopher T. Greco, and Aparna Yenamandra
(joshua.sussberg@kirkland.com; christopher.greco@kirkland.com, aparna.yenamandra@kirkland.com)

(2) If to a Consenting Lender or a transferee thereof, to the addresses or facsimile numbers set forth below following such Consenting Lender's signature (or as directed by any transferee thereof), as the case may be, with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Jeffrey D. Saferstein and Adam M. Denhoff
(jsaferstein@paulweiss.com; adenhoff@paulweiss.com)

(3) If to Charles Chanaratsopon, to:

Charles Chanaratsopon
5999 Savoy Drive
Houston, Texas 77036

With a copy to:
Andrews Kurth Kenyon LLP
600 Travis Street
Suite 4200
Houston, TX 77002
Attention: Timothy A. "Tad" Davidson II and Joseph P. Rovira
(taddavidson@andrewskurth.com; josephrovira@andrewskurth.com)

(4) If to Hancock Park Associates, to:

Hancock Park Associates
1980 Post Oak Blvd Suite 2150
Houston, TX 77056
Attention: Kenneth G. Walter, Jr.
(kwatler@hpcap.com)

With a copy to:
Andrews Kurth Kenyon LLP
600 Travis Street
Suite 4200
Houston, TX 77002
Attention: Timothy A. Davidson

(4) If to TSG Consumer Partners, to:

TSG Consumer Partners
600 Montgomery Street, Suite 2900
San Francisco, CA 94111
Attention: Dan Costello
dcostello@tsgconsumer.com

With a copy to:
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attention: Gregg M. Galardi
gregg.galardi@ropesgray.com

Any notice given by electronic mail, facsimile, delivery, mail or courier shall be effective when received.

**22.    Reservation of Rights; No Admission.**

(a)    Nothing contained herein shall (i) limit (A) the ability of any Party to consult with other Parties, or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder, or under the terms of the Plan; (ii) limit the ability of any Party to sell or enter into any transactions in connection with the Debtor Claims/Interests, or any other claims against or interests in the Company, subject to the terms of Section 6 hereof; (iii) limit the rights of any Consenting Lender under the Term Loan Agreement, or any agreements executed in connection with the Term Loan Agreement, or (iv)

23

constitute a waiver or amendment of any provision of the Term Loan Agreement or any agreements executed in connection with the Term Loan Agreement.

(b)     Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries. This Agreement and the Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

## 23.     <u>Relationship Among Consenting Lenders.</u>

(a)     It is understood and agreed that no Consenting Lender has any duty of trust or confidence in any kind or form with any other Consenting Lender, and, except as expressly provided in this Agreement or the Term Loan DIP Credit Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Consenting Lender may trade in the Term Loan Claims, or other debt or equity securities of the Company without the consent of the Company or any other Consenting Lender, subject to applicable securities laws, the terms of this Agreement and any confidentiality agreement entered into with the Company; provided, however, that no Consenting Lender shall have any responsibility for any such trading to any other person or entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Consenting Lenders shall in any way affect or negate this understanding and agreement.

## 24.     <u>No Solicitation; Representation by Counsel; Adequate Information.</u>

(a)     This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases. The acceptances of the Consenting Lenders and Owners, as applicable, with respect to the Plan will not be solicited until such Consenting Lender has received the Disclosure Statement and related ballots and solicitation materials, each as approved by the Bankruptcy Court.

(b)     Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)     Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Lender acknowledges, agrees and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933, (ii) understands that any securities to be acquired by it pursuant to the Restructuring Transactions have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Lender's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iii) has such knowledge and experience in financial and business matters that such Consenting Lender is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring Transactions and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

[Signature pages redacted]

**EXHIBIT A**
**Term Sheet**

**CHARMING CHARLIE HOLDINGS INC., ET AL.**

**RESTRUCTURING TERM SHEET**

**DECEMBER 11, 2017**

THIS TERM SHEET (THIS "TERM SHEET") IS ATTACHED TO A PLAN SUPPORT AGREEMENT (THE "PSA")[1] AND DESCRIBES THE MATERIAL TERMS OF A PROPOSED RESTRUCTURING (THE "RESTRUCTURING") PURSUANT TO WHICH CHARMING CHARLIE HOLDINGS INC., ET AL. ("PARENT") AND PARENT'S SUBSIDIARIES THAT ARE PARTIES TO THE PSA (COLLECTIVELY WITH PARENT, THE "COMPANY") WILL RESTRUCTURE THEIR CAPITAL STRUCTURE THROUGH A JOINT PLAN OF REORGANIZATION (THE "PLAN") FILED IN CONNECTION WITH VOLUNTARY CASES (THE "CHAPTER 11 CASES") COMMENCED BY THE COMPANY UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT").

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE PLAN AND THE RELATED DEFINITIVE DOCUMENTATION GOVERNING THE RESTRUCTURING IDENTIFIED IN THE PSA. SUCH DEFINITIVE DOCUMENTS, ALL MOTIONS, AND RELATED ORDERS AND THE PLAN SOLICITATION DOCUMENTS SHALL SATISFY THE REQUIREMENTS OF THE BANKRUPTCY CODE, THE PSA, AND THIS TERM SHEET.

| Summary | |
|---|---|
| **Transaction Structure** | The Company will commence the Chapter 11 Cases and implement the Restructuring pursuant to the Plan on the terms set forth in the PSA and as described herein, *provided*, *however*, that before and after commencement of the Chapter 11 Cases, the Company will continue to evaluate whether there are viable alternative restructuring proposals that represent a higher or otherwise better offer to the Company's stakeholders than the Restructuring. The Restructuring will be effectuated and structured in a tax-efficient manner determined by the Debtors and the Requisite First Lien Lenders. |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PSA.

| New Financing | |
|---|---|
| **DIP Financing** | • **ABL DIP Facility**: The Company will file a motion on the Petition Date seeking approval of an up to $35 million DIP Facility, which facility shall be reasonably acceptable to the Requisite First Lien Lenders and acceptable to the Company and the administrative agent and lenders thereto under that certain credit agreement, dated as of June 22, 2015 (as amended or modified from time to time) among Charming Charlie LLC, as Lead Borrower, the other borrowers party thereto, Charming Charlie Holdings Inc., the guarantors from time to time party thereto, the lenders party thereto (the "***ABL Revolving Credit Agreement***," the Claims[2] arising thereunder, the "***ABL Claims***," the administrative agent and lenders thereto, collectively, the "***ABL Lenders***," and the Claims under the ABL DIP Facility, the "***ABL DIP Claims***").<br><br>• **Term Loan DIP Facility**:  The Company will file a motion on the Petition Date, seeking approval of a $60 million DIP Facility, which facility shall be acceptable to the Company and the Requisite First Lien Lenders and reasonably acceptable to the ABL Lenders (the claims under such Term Loan DIP Facility, the "***Term Loan DIP Claims***," and the lenders funding the Term Loan DIP Facility, the "***Term Loan DIP Lenders***").  The Term Loan DIP Facility shall consist of: (a) $20 million in aggregate principal amount of new money term loans, which shall be available to the Company on the terms and conditions set forth in the Term Loan DIP Credit Agreement (collectively, the "***New Money DIP Loans***," and the claims thereunder, the "***New Money DIP Loan Claims***"); and (b) $40 million in aggregate principal amount of term loans rolling up, pursuant to the final order approving the Term Loan DIP Facility, amounts due and owing to the Term Loan DIP Lenders as of the Petition Date under the Term Loan Agreement (the "***Roll-up DIP Loans***," and the claims thereunder, the "***Roll-up DIP Loan Claims***"). |
| Post-Effective Date Capital Structure | |
| **Reorganized Company Capital Structure** | The capital structure of the reorganized Company (the "***Reorganized Debtors***") upon emergence shall consist of the following:<br><br>• Either (a) a new revolving credit facility in the aggregate commitment amount of $35 million (the "***New Revolving Credit Facility***"), or (b) if the Company has not closed on a New Revolving Credit Facility on or before the Effective Date, an exit facility into which the ABL DIP Claims shall be converted on the Effective Date (the "***ABL Exit Facility***").  The New Revolving Credit Facility or the ABL Exit |

---

[2]      "Claims" shall mean any "claims" as defined in section 101(5) of the Bankruptcy Code against the Company, whether or not asserted.

Facility, as applicable, shall (a) be secured by a first priority lien on the collateral that currently secures the ABL Claims and a second priority lien on the collateral that currently secures the Term Loan Claims, (b) have material terms and conditions that are substantially similar to those in the existing ABL Revolving Credit Agreement, and (c) be acceptable to the Requisite First Lien Lenders.

- A new senior secured term loan facility, which shall consist of (a) tranche A term loans in an aggregate principal amount of $20 million (the "***New Tranche A Term Loans***"), and (b) tranche B term loans in an aggregate principal amount of $30 million (the "***New Tranche B Term Loans***," and, together with the New Tranche A Term Loans, the "***New Term Loan Facility***"). The New Term Loan Facility shall include the following material terms:

  - *New Tranche A Term Loans – Interest*: (i) from the Effective Date until the first anniversary thereof, [LIBOR + 5.0%] payable in cash and [+ 5.0%] payable in kind, and (ii) following the first anniversary of the Effective Date, [LIBOR + 10.0%] payable in cash. The LIBOR floor shall be 1.0%.
  - *New Tranche B Term Loans – Interest*: [LIBOR + 1.0%] payable in cash and [+ 9.0%] payable in kind. The LIBOR floor shall be 1.0.%
  - *Amortization*: 2.5% per annum (payable quarterly) beginning in the second year following the Effective Date, applicable to both the New Tranche A Term Loans and the New Tranche B Term Loans.
  - *Excess Cash Flow Sweep*: 50%, with payments split *pro rata* between the New Tranche A Term Loans and the New Tranche B Term Loans.
  - *Security/Priority*: Secured by a first priority lien on the collateral that currently secures the Term Loan Claims and a second priority lien on the collateral that currently secures the ABL Claims. The New Tranche A Term Loans shall *pari passu* in all respects with the New Tranche B Term Loans.
  - *Rating*: The Company will use reasonable efforts to obtain a private rating for the New Term Loan Facility.
  - *Other Terms/Conditions*: The New Term Loan Facility shall contain other terms and conditions to be negotiated in good faith between the Company and the Term Loan DIP Lenders, and which shall be acceptable to the Term Loan DIP Lenders.

- A single class of equity interests in the reorganized Parent (the "***Reorganized HoldCo Equity***").

| | The Company will use commercially reasonable efforts to obtain any additional exit financing necessary to satisfy section 1129 of the Bankruptcy Code on the best available terms in the market. |
|---|---|
| **Treatment of Claims and Interests** | |
| **Treatment of ABL Claims** | • Pursuant to the order approving the ABL DIP Facility on a final basis, proceeds of the ABL DIP Facility shall be used to repay the ABL Claims in full on the terms set forth therein. |
| **Treatment of ABL DIP Claims** | • On the Effective Date, each holder of an ABL DIP Claim will receive, in full and final satisfaction of such Claim, its *pro rata* share of either (i) indefeasible payment in full in cash from the proceeds of the New Revolving Credit Facility, or (ii) with the consent of such holder, the ABL Exit Facility. |
| **Treatment of Term Loan DIP Claims** | • On the Effective Date, each holder of a Term Loan DIP Claim will receive, in full and final satisfaction of such Claim, its *pro rata* share of (i) $20 million in aggregate principal amount of the New Tranche A Term Loans on account of its New Money DIP Loan Claims, and (ii)(a) $30 million in aggregate principal amount of the New Tranche B Term Loans, and (b) 75% of the Reorganized HoldCo Equity (subject to dilution only on account of shares of Reorganized HoldCo Equity issued or available for issuance under the Management Incentive Plan), in each case on account of its Roll-up DIP Loan Claims. |
| **Treatment of Term Loan Claims** | • On the Effective Date, each holder of a Term Loan Claim will receive, in full and final satisfaction of such Claim, its *pro rata* share of 25% of the Reorganized HoldCo Equity (subject to dilution only on account of shares of Reorganized HoldCo Equity issued or available for issuance under the Management Incentive Plan). |
| **Administrative Claims**<br><br>**Priority Tax Claims**<br><br>**Other Priority Claims**<br><br>**Other Secured Claims** | • Paid in full in cash or, with the consent of Requisite First Lien Lenders, such other customary treatment that renders such claims unimpaired under the Bankruptcy Code. |

| | |
|---|---|
| **General Unsecured Claims** | • General unsecured claims will receive such consideration, if any, as agreed upon by the Debtors and the Requisite First Lien Lenders. |
| **Existing Equity Interests in the Company** | • Cancelled with no distribution. |
| **Releases[3]** | |
| **Releases by the Company** | Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Company from and after the Petition Date (the "***Debtors***") and the implementation of the restructuring contemplated by the Plan, pursuant to the confirmation order and on and after the Effective Date, the Released Parties and their respective property are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released, acquitted and discharged by the Debtors, the Reorganized Debtors and the Debtors' Estates from any and all Claims, Debts, obligations, rights, suits, damages, debts, causes of action (except with respect to causes of action that may be asserted by Holders of Claims against any other Holders of Claims pursuant to an intercreditor agreement), remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute, violations of federal or state securities laws or otherwise that the debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Debtors' restructuring, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the PSA, the Plan Supplement, the Disclosure Statement, the documentation and negotiation of the New Term Loan Facility, the New Revolving Credit Facility (if any), the ABL Exit Facility (if any), any exit financing facilities, and any related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date. |

---

[3] As will be set forth in the Plan, the Parties will negotiate the customary definition of capitalized terms used but not defined in this section.

| | |
|---|---|
| | The foregoing release (1) shall not apply to any express contractual or financial obligations or any right or obligations arising under or that is part of the Plan or any agreements entered into pursuant to, in connection with or contemplated by the Plan, (2) shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct, and (3) shall not release any claims held by any non-Debtor. Upon the Effective Date, including the effectiveness of the releases set forth herein and as will be set forth in the Plan and Confirmation Order, any claims filed by an Owner will be deemed expunged without further action. For the avoidance of doubt, the Debtors and Reorganized Debtors will continue to honor all postpetition and post-Effective Date obligations under the New Term Loan Facility, the New Revolving Credit Facility (if any), the ABL Exit Facility (if any), any exit facilities, and any related agreements, instruments, or other documents. |
| **Releases by Holders of Claims and Equity Interests** | As of the Effective Date, each of the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released, acquitted and discharged the Debtors, the Reorganized Debtors and the Released Parties and their respective property from any and all Claims, obligations, rights, suits, damages, debts, causes of action (except with respect to causes of action that may be asserted by Holders of Claims against any other Holders of Claims pursuant to an intercreditor agreement), remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that such entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the PSA, the documentation and negotiation of the New Term Loan Facility, the New Revolving Credit Facility (if any), the ABL Exit Facility (if any), any exit financing facilities, and any related agreements, instruments or other documents, any other act or omission, transaction, agreement, event, or other occurrence |

6

taking place on or before the Confirmation Date.

Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party or entity under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the right to receive distributions from the Debtors or the Reorganized Debtors on account of an allowed claim against the Debtors pursuant to this Plan (which, for the avoidance of doubt, shall include obligations under or in connection with the Term Loan DIP Facility, the New Term Loan Facility, the New Revolving Credit Facility (if any), the ABL Exit Facility (if any), any exit facilities, and any related agreements, instruments, or other documents).

Notwithstanding the foregoing, the Debtors and the Reorganized Debtors will continue to honor all postpetition and post-Effective Date obligations under any assumed executory contracts and unexpired leases in accordance with their terms, regardless of whether such obligations are listed as a cure amount, and whether such obligations accrued prior to or after the Effective Date, and neither the payment of cure nor entry of the Confirmation Order shall be deemed to release the Debtors or the Reorganized Debtors from such obligations.

Notwithstanding anything to the contrary in the foregoing, the release set forth above (1) does not release the personal liability of any of the aforementioned Released Parties for any statutory violation of applicable tax laws or bar any right of action asserted by a governmental taxing authority against the aforementioned Released Parties for any statutory violation of applicable tax laws and (2) shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.

| | |
|---|---|
| **Released Parties** | "*Released Parties*" means, collectively the Debtors and the Debtors' current officers and directors as well as any former independent directors, the administrative and collateral agents under the Term Loan Agreement and the ABL Revolving Credit Agreement, the Holders of Term Loan Claims, the Holders of ABL Claims, the Owners, the agent under the ABL DIP Facility, the agent under the Term Loan DIP Facility, the Term Loan DIP Lenders, the ABL DIP Lenders, all other exit facility lenders (if any), the Consenting Lenders, any party to the PSA, the Holders of existing Equity Interests in the Company, and with respect to each of the Entities listed above, such Entity's predecessors, successors, assigns, direct and indirect subsidiaries, affiliates, current and former officers and directors, principals, shareholders, employees, members, partners, managers, agents, advisory board members, attorneys, financial advisors, investment bankers, |

| | accountants, consultants and other professionals or representatives each solely in their capacities as such; *provided*, *however*, that any Holder of a Claim that "opts" out of the release set forth in its Ballot shall not be considered to be included in the definition of "Released Parties." |
|---|---|
| **Releasing Party** | "**Releasing Parties**" means, collectively, the administrative and collateral agents under the Term Loan Agreement and the ABL Revolving Credit Agreement, the Holders of Term Loan Claims, the Holders of ABL Claims, the Owners, the agent under the ABL DIP Facility, the agent under the Term Loan DIP Facility, the Term Loan DIP Lenders, the ABL DIP Lenders, all other exit facility lenders (if any), the Consenting Lenders, any party to the PSA, the Holders of existing Equity Interests in the Company, the Debtors' current officers and directors, each Holder of a Claim that votes to accept the Plan and does not affirmatively elect to "opt out" of being a Releasing Party and Released Party on its Ballot, each Holder of a Claim entitled to vote for or against the Plan that votes to reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party, and with respect to each of the Entities listed above, such Entity's predecessors, successors, assigns, direct and indirect subsidiaries, affiliates, current and former officers and directors, principals, shareholders, employees, members, partners, managers, agents, advisory board members, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives each solely in their capacities as such. |
| **Other Terms** | |
| **Management Incentive Plan** | As soon as reasonably practicable after the Effective Date, the Company will implement a management incentive plan for up to 10% of the Reorganized HoldCo Equity on terms and conditions to be determined by the board of directors of the reorganized Parent (the "<u>Management Incentive Plan</u>"). |
| **Indemnification of Prepetition Officers and Directors** | The Plan shall provide that all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, board resolutions, indemnification agreements, or employment contracts) for the directors, officers, and employees of the Company serving on or after the commencement of the Chapter 11 Cases shall survive and remain in place following the Effective Date.<br><br>On and after the Effective Date, the Reorganized Debtors shall use reasonable efforts to continue to maintain in effect for a period of at least six (6) years from and after the Effective Date, insurance with respect to directors' and officers' liability insurance and fiduciary liability insurance from and after the Effective Date. |
| **Assumption of Employment** | Pursuant to the Plan, on the Effective Date of the Plan, the Reorganized Debtors shall enter into new employment agreements with each of (i) the |

| Agreements | Company's current Chief Financial Officer; (ii) the Company's current Executive Vice President for Merchandising; (iii) the Company's current Senior Vice President for Real Estate, Legal, and (iv) the Company's current Senior Vice President for Human Resources (collectively, the "***Covered Persons***") on terms satisfactory to the Reorganized Debtors and each such Covered Person, the agreed-upon forms of which shall be set forth in the Plan Supplement (collectively, the "***New Employment Agreements***"). |
|---|---|
| **Board of Directors** | The board of directors of the reorganized Parent (or such other body that will become the ultimate governing authority for the reorganized Parent) shall be comprised of five members, one of which shall be the Chief Executive Officer of the reorganized Parent, and four of which shall be selected in a manner determined by the Consenting Term Loan Committee. |

# EXHIBIT B

FORM OF TRANSFER AGREEMENT FOR CONSENTING LENDERS

This Transfer Agreement to the Plan Support Agreement, dated as of December 11, 2017 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among Charming Charlie Holdings Inc. on behalf of itself and certain of its subsidiaries collectively, the "*Company*"),[1] the lenders signatory thereto (together with their respective successors and permitted assigns, the "Consenting Lenders" and each, a "Consenting Lender"), and the equity holders party thereto (the "Owners") is executed and delivered by [_____] (the "Joining Party") as of [_____], 2017.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Transfer Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Lender or Owner, as applicable," and a "Party" for all purposes under the Agreement and with respect to any and all Debtor Claims/Interests held by such Joining Party.

2. Governing Law.  This Transfer Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

\* \* \* \* \*

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

---

[1]    The entities included in the definition of "Company" are as follows:  Charming Charlie Holdings, Inc.; Charming Charlie International LLC; Charming Charlie USA, Inc.; Charming Charlie LLC; Charming Charlie Canada LLC; Poseidon Partners CMS, Inc.; Charming Charlie Manhattan LLC.

IN WITNESS WHEREOF, the Joining Party has caused this Transfer Agreement to be executed as of the date first written above.

**[CONSENTING LENDER]**

By: _____

Name: _____

Title: _____

Principal Amount of Term Loan Claims: $_____

Notice Address:

_____
_____
_____
Fax: _____
Attention: _____
Email: