**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| CHARMING CHARLIE HOLDINGS INC., *et al.*,[1] | ) | Case No. 17-12906 (CSS) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EMPLOYEE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:[2]

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"): (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, commissions, other compensation, and reimbursable employee expenses and (ii) continue employee benefits

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Charming Charlie Canada LLC (0693); Charming Charlie Holdings Inc. (6139); Charming Charlie International LLC (5887); Charming Charlie LLC (0263); Charming Charlie Manhattan LLC (7408); Charming Charlie USA, Inc. (3973); and Poseidon Partners CMS, Inc. (3302). The location of the Debtors' service address is: 5999 Savoy Drive, Houston, Texas 77036.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Robert Adamek, Chief Financial Officer of Charming Charlie Holdings Inc. in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on December 11, 2017 (the "Petition Date"). Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

programs in the ordinary course, including payment of certain prepetition obligations related thereto, in an aggregate amount not to exceed $4,303,000 pursuant to the Interim Order and $4,649,200 pursuant to the Final Order; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 30 days of the commencement of these chapter 11 cases to consider entry of the Final Order.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(m).

**The Debtors' Workforce**

5. As of the Petition Date, the Debtors employ approximately 5,665 employees (the "Employees"), including approximately 1,065 full-time employees and approximately 4,600 part-time employees. In addition to the Employees, the Debtors also periodically retain specialized

individuals as independent contractors, as well as temporary workers (the "Temporary Staff") sourced regularly from various staffing agencies (the "Staffing Agencies") to fulfill certain duties on a short- and long-term basis. At this time, the Debtors retain approximately 10 Temporary Staff.

6. The Employees and Temporary Staff perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates. In many instances, the Employees and Temporary Staff include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced. Without the continued, uninterrupted services of the Employees and the Temporary Staff, the ability of the Debtors to maximize creditor recoveries through an orderly accounts receivable collection, the sale or other disposal of assets, and the general administration of the Debtors' estates will be materially impaired.

7. Additionally, many of the Employees and Temporary Staff rely on their compensation and benefits to pay their daily living expenses. Thus, the Employees and Temporary Staff will be exposed to significant financial constraints if the Debtors are not permitted to continue paying the Employees' and Temporary Staff's compensation and providing the Employees with health and other benefits. Without the continued, uninterrupted services of their Employees and Temporary Staff, the Debtors' reorganization efforts will be threatened. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

**Employee Compensation and Benefits**

8. To minimize the personal hardship the Employees could suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain stability in the Debtors' workforce during the administration of the Debtors' chapter 11 cases, the Debtors, by

this motion, seek authority, but not direction, to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, commissions, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, health insurance, retirement health and related benefits, workers' compensation benefits, life insurance, short- and long-term disability coverage, non-insider severance, certain director compensation, and certain other benefits that the Debtors have historically provided in the ordinary course (collectively, the "Employee Compensation and Benefits"); and (b) pay all costs incident to the Employee Compensation and Benefits, collectively in an aggregate amount not to exceed $4,303,000 pursuant to the Interim Order and $4,649,200 pursuant to the Final Order.

9. Subject to approval from the Court, the Debtors intend to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course. Out of an abundance of caution, the Debtors further request authority to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course during these chapter 11 cases without the need for further Court approval, subject to the Bankruptcy Code and any other provisions of applicable law.

10. By this Motion, the Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits:

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| **Employee Compensation** | **$3,992,500** | **$3,992,500** |
| Unpaid Compensation | $2,700,000 | $2,700,000 |
| Temporary Staff Compensation | $137,500 | $137,500 |
| Withholding Obligations | $850,000 | $ 850,000 |
| Payroll Processing Fees | $140,000 | $140,000 |
| Reimbursable Expenses | $165,000 | $165,000 |
| **Non-Insider Employee Incentive Programs** | **$33,000** | **$58,000** |

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| **Employee Benefits Programs** | **$277,500** | **$277,500** |
| Health Benefit Plans | $245,000 | $245,000 |
| Life and AD&D Insurance | $2,000 | $2,000 |
| Auxiliary Benefits | $8,000 | $8,000 |
| Disability Benefits | $7,000 | $7,000 |
| Workers' Compensation Program | N/A | N/A |
| 401(k) Plan | $15,500 | $15,500 |
| Paid Time Off / Paid Leave | N/A | N/A |
| **Severance** | **$0** | **$321,200** |
| **Postpetition Non-Employee Director Compensation** | **N/A** | **N/A** |
| **Total** | **$4,303,000** | **$4,649,200** |

## I. Employee Compensation and Withholding Obligations.

### A. Unpaid Compensation.

11. In the ordinary course, the Debtors incur obligations to their Employees for, among other things, wages, salaries, overtime, sales commissions, and other obligations described herein (collectively, the "Employee Compensation"). The Debtors' historical average monthly gross Employee Compensation, including wages, salaries, and related compensation, has been approximately $7.9 million. In light of the Debtors' planned store closings and related reductions in force,[3] the Debtors anticipate that their monthly gross Employee Compensation, including wages, salaries, and related compensation, will range from approximately $4 million to approximately $8 million during the pendency of these chapter 11 cases. As of the Petition Date, the Debtors estimate that they owe approximately $2.7 million on account of Employee Compensation earned by Employees prior to the Petition Date (the "Unpaid Compensation"), all

3 The Debtors planned store closing are discussed in more detail in *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief*, filed contemporaneously herewith.

of which will come due within the first 30 days of these chapter 11 cases. As described above, loss of the Unpaid Compensation that the Employees are owed could cause such Employees to experience financial hardship. In light of the substantial benefit the Employees will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship.

12. Accordingly, by this motion the Debtors seek authority, but not direction, to pay their Employees any Unpaid Compensation in the ordinary course and consistent with past practice and to continue the Employee Compensation in the ordinary course. For the avoidance of doubt, the Debtors seek to pay Unpaid Compensation to any Employee in excess of the $12,850 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code, if any, pursuant to the Final Order only.

**B. Temporary Staff Compensation.**

13. The Debtors make payments to Staffing Agencies, independent contractors, and directly to temporary workers on account of Temporary Staff (the "Temporary Staff Compensation"), for the performance of certain services critical to the Debtors' operations, including, among other things, retail finance advisory services. The Debtors' Employees rely on the support of Temporary Staff to complete discrete projects in furtherance of the Debtors' businesses and to fill short-term positions. The Debtors believe the authority to continue paying the Staffing Agencies, independent contractors, and directly to temporary workers is critical to minimize disruption of the Debtors' continued business operations.

14. In the 12 months before the Petition Date, the Debtors spent approximately $990,000 on Temporary Staff and staffing agencies in the aggregate. As of the Petition Date, the Debtors estimate that Temporary Staff and Staffing Agencies are owed an aggregate of approximately $137,500 on account of accrued services rendered prior to the Petition Date, approximately $100,000 of which is owed to Staffing Agencies. The Debtors do not believe they

owe any individual Independent Contractor or any individual temporary Employee an amount in excess of $12,850.

**C. Withholding Obligations.**

15. During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

16. In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.

17. As of the Petition Date, the Debtors estimate that they will have minimal, if any, unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") outstanding, and in any event not more than $850,000, all of which would come due within the first 30 days of these chapter 11 cases. By this motion, the Debtors seek authority, but not direction, to pay in a manner consistent with historical practice any unpaid Withholding Obligations and to continue to honor

the Withholding Obligations in the ordinary course during the administration of these chapter 11 cases.

**D. Payroll Processing.**

18. Certain Withholding Obligations for the Debtors' Employees are processed and administered by ADP or its Canadian affiliate ("ADP"). The Debtors pay approximately $35,000 per pay period for such services. As of the Petition Date, the Debtors estimate they owe $105,000 to $140,000 on account of prepetition payroll services (the "Unpaid Payroll Processing Fees"), all of which will come due within the first 30 days of these chapter 11 cases. By this motion, the Debtors seek authority, but not direction, to pay the Unpaid Payroll Processing Fees in the ordinary course and consistent with past practice and to continue payroll processing in the ordinary course during the administration of these chapter 11 cases.

**E. Reimbursable Expenses.**

19. Prior to the Petition Date and in the ordinary course, the Debtors reimbursed Employees or paid credit card invoices of certain Employees for approved expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are largely on account of costs incurred related to (a) employee travel for reasonable business related purposes or (b) payments to vendors or services (*e.g.* Facebook, LinkedIn, and other social media). Employees who pay up front for Reimbursable Expenses apply for reimbursement by submitting an expense report to the Debtors. Once they have determined that the charges are for legitimate reimbursable business expenses, the Debtors reimburse Employees for these expenses within 14 days. The Debtors' inability to reimburse such expenses could impose hardship on such individuals, where such individuals otherwise incurred obligations for the Debtors' benefit.

20. On average, the Debtors pay Reimbursable Expenses of approximately $106,000 per month in the aggregate. As of the Petition Date, the Debtors estimate that they owe approximately $165,000 in aggregate Reimbursable Expenses, all of which would come due within the first 30 days of these chapter 11 cases.

21. Although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur and Employees may submit reimbursement requests for prepetition expenses after the Petition Date. Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed fully. Accordingly, to avoid harming Employees who incurred the Reimbursable Expenses and who may become personally liable for such expenses, the Debtors request authority, but not direction, to pay the Reimbursable Expenses and to continue to pay the Reimbursable Expenses in the ordinary course.

## II. Non-Insider Employee Incentive Programs.

22. The Debtors maintain a number of incentive programs to drive performance among their Employees, including store and manager-level bonus programs and the Company Bonus Program (collectively, the "Non-Insider Employee Incentive Programs").

23. The Debtors offer bonuses to store employees based on whether the monthly store sales exceed the established monthly plan. The Debtors also offer bonuses to area managers based on a store's performance in relation to the established monthly plan and offer bonuses to district managers based on (a) the company's earnings before interest, tax, depreciation and amortization ("EBITDA"), and (b) whether sales are greater than the established monthly plan.

24. In addition, the Debtors offer bonuses to non-store Employees based on the company's performance (the "Company Bonus Program"). Under the Company Bonus Program, eligible Employees may earn a bonus based on the company's performance in relation to its target

for (a) adjusted EBITDA, and (b) comparative store sales. The Debtors are evaluating an adjustment to the intervals at which an Employee may earn a bonus under the Company Bonus Program, while preserving the other bonus metrics including size and target performance levels, and request authority to implement such adjustment during the chapter 11 cases.

25. The Debtors currently have $33,000 in outstanding obligations to Employees on account of the Non-Insider Employee Incentive Programs. The Debtors expect the total amount payable to Employees who are not insiders (as such term is defined in section 101(31) of the Bankruptcy Code) under the Non-Insider Employee Incentive Programs during the pendency of the case will be approximately $58,000. The Non-Insider Employee Incentive Programs are critical to meeting the Debtors' target revenues and EBITDA. Accordingly, the Debtors seek authority, but not direction, to pay in a manner consistent with historical practice any unpaid prepetition amounts on account of Non-Insider Employee Incentive Programs and to continue the Non-Insider Employee Incentive Programs in the ordinary course during the administration of these chapter 11 cases.

**III. Employee Benefits Programs.**

26. The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical and dental plans, life insurance, accidental death and dismemberment insurance, disability benefits, workers' compensation, retirement plans, incentive programs, paid time off, severance, director compensation, and other employee benefit plans (collectively, the "Employee Benefits Programs").

27. As described above, failure to continue the Employee Benefits Programs could cause Employees to experience severe hardship. In light of the substantial benefit the Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid

imposing such a hardship. Accordingly, by this motion, the Debtors seek authority, but not direction, to: (a) pay any unpaid amounts due with respect to the Employee Benefits Programs; and (b) continue to provide Employee Benefits Programs in the ordinary course during the administration of these chapter 11 cases. As of the Petition Date, the Debtors estimate that they owe approximately $275,000 on account of the Employee Benefits Programs, all of which will come due within the first 30 days of these chapter 11 cases. The Employee Benefits Programs are described in greater detail below.

**A. Health Benefit Plans.**

28. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including medical and dental plans (collectively, the "Health Benefit Plans"). Specifically, the Debtors provide the following:

- Healthcare Plan: The Debtors' healthcare plan (the "Healthcare Plan") is administered by Aetna in the United States and Manulife Financial in Canada. The Debtors pay approximately $480,000 per month related to the Healthcare Plan. As of the Petition Date, the Debtors estimated that they owe approximately $187,500 under the Healthcare Plan.

- Dental Plan: Additionally, the Debtors offer their Employees the option of participating in a dental plan (the "Dental Plan") administered by Aetna in the United States and Manulife Financial in Canada. As of the Petition Date, the Debtors estimate that they owe approximately $8,000 under the Dental Plan.

- Vision Plan: The Debtors also offer their Employees the option of participating in a vision plan (the "Vision Plan") administered by Vision Services Plan in the United States and Manulife Financial in Canada, which is covered by Employee pay period deductions. As of the Petition Date, the Debtors estimate that they owe approximately $6,000 on account of the Vision Plan. The Debtors estimate that the ongoing monthly administrative cost of the Vision Plan is approximately $15,000.

29. The Debtors also provide Employees who participate in certain of the Health Benefit Plans with access to a flexible spending account (the "FSA"), administered by Wage

Works. The FSA allows such Employees to contribute pre-tax dollars for eligible healthcare expenses. The Debtors do not make any contributions to the FSAs.

30. Because the Debtors do not contribute to Employees' FSAs, the Debtors believe the FSA amounts are generally held in trust by the Debtors and are not property of their estates. However, over the course of each year, Employees may utilize the FSA amounts held by the Debtors to pay for a wide variety of health and dependent care not otherwise covered by the Health Benefit Plans. When an Employee seeks to use their elected FSA amounts, the Debtors' remit such amount to the requested healthcare provider through Wage Works. As of the Petition Date, the Debtors estimate that there are approximately $6,000 in accrued amounts to be remitted on account of the FSA (the "Unremitted FSA Amounts"), of which $6,000 will be required to be remitted during the Interim Period.

31. Further, the Debtors pay a monthly administration fee of approximately $1,500 to WageWorks, Inc. on account of the FSA program (the "FSA Fees"). As of the Petition Date, the Debtors believe they are current on account of accrued but unpaid FSA Fees (the "Unpaid FSA Fees" and together with the Unremitted FSA Amounts, the "FSA Costs"), but include this description out of an abundance of caution and seek authority to pay Unpaid FSA Fees if any become due. As a result, the Debtors seek authority, but not direction, pursuant to the Interim Order and the Final Order to pay and/or remit the FSA Costs and continue the FSA in the ordinary course of business on a postpetition basis.

32. For certain Employees who participate in high deductible Healthcare Plans, the Debtors offer access to a health savings account (the "HSA") through PayFlex Bank. Participating Employees can opt to make pre-tax contributions to their individual HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by

the IRS. On average, the Debtors contribute approximately $60,000 on an annual basis on account of costs relating to the HSA (the "HSA Costs"). As of the Petition Date, the Debtors believe they owe approximately $4,700 in accrued but unpaid HSA Costs (the "Unpaid HSA Costs"), $4,700 of which will become due and owing during the Interim Period. Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to pay and/or remit the Unpaid HSA Costs and to continue the HSA in the ordinary course of business on a postpetition basis.

**B. Other Insurance, Disability Benefits, and Employee Assistance Programs.**

**1. Life and AD&D Insurance Programs.**

33. The Debtors provide life and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance") to Employees through Aetna in the United States and Manulife Financial in Canada. In the United States, the company-paid life insurance benefit is one times the Employee's annual base salary (rounded to the next higher $1,000) and is capped at $250,000. In Canada, the company-paid life insurance benefit is one times the Employee's annual base salary and is capped at $500,000 (amounts are reduced by 50% at age 65 and terminate at age 70).

34. The company-paid accidental death and dismemberment insurance is equal to one times the Employee's annual base salary (rounded to the next higher $1,000) and is capped at at $200,000. In Canada, the company-paid life accidental death and dismemberment benefit is one times the Employee's annual base salary and is capped at $500,000 (amounts are reduced by 50% at age 65 and terminate at age 70).

35. Employees also may purchase voluntary life insurance and accidental death and dismemberment insurance (the "Voluntary Life and AD&D Insurance") through Aetna. As of the Petition Date, the Debtors estimated that they owe approximately $2,000 on account of the Basic Life and AD&D Insurance and Voluntary Life and AD&D Insurance.

**2. Disability Benefits.**

36. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits") through Aetna in the United States and Manulife Financial in Canada.[4]

37. In the United States, the short-term disability benefit replaces a portion of the Employee's income (60% of base salary) if the Employee is unable to work due to non-work related injury, illness, or medical condition. The total weeks payable of the short-term disability benefit is based on years of service and medical necessity. The long-term disability benefit replaces a portion of the Employee's income (60% of base salary) after a 26-week elimination period has been satisfied.

38. In Canada, the short-term disability benefit replaces a portion of the Employee's income (66.7% of weekly earnings), up to a maximum of $1,000 per week, for up to 26 weeks. The long-term disability benefit replaces a portion of the Employee's income (66.7% of weekly earnings) after a 179 week elimination period has been satisfied.

39. As of the Petition Date, the Debtors estimated that they owe approximately $7,000 on account of the Disability Benefits.

**3. Other Insurance**

40. The Debtors also offer certain auxiliary benefits, including group accident insurance and group critical illness insurance through Met Life and group whole life through Mass Mutual[5] (collectively, the "Auxiliary Benefits"). As of the Petition Date, the Debtors estimated that they owe approximately $8,000 on account of the Auxiliary Benefits.

---

4 A certain Employee Assistance Program is included in the long term disability benefit through Aetna, where Employees and their immediate family members are given access to consultants to for help with short-term problems.

5 Mass Mutual will not offer whole life insurance in 2018.

**C. Workers' Compensation Program.**

41. The Debtors maintain workers' compensation insurance for their Employees (or are otherwise self-insured) at the statutorily required level for each state in which the Debtors have Employees (collectively, the "Workers' Compensation Program"). The Debtors maintain coverage for the Workers' Compensation Program through Zurich.

42. The Debtors pay approximately $720,000 in premiums and fees annually to maintain the Workers' Compensation Program (the "Workers' Compensation Coverage Fees") through a down payment and six installment payments. As of the Petition Date, the Debtors estimate that they owe one final installment payment of approximately $80,000 on account of accrued but unpaid Workers' Compensation Coverage Fees (the "Unpaid Workers' Compensation Coverage Fees"). The Debtors are seeking authority to pay Unpaid Workers' Compensation Coverage Fees, if any, pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Maintain the Customs Surety Bonds, and (E) Honor the Terms of the Financing Agreement and Pay Premiums Thereunder, and (II) Granting Related Relief*, filed contemporaneously herewith.

43. The Debtors also attempt to negotiate general releases in exchange for the settlement of some Employee claims (the "Employment Claims Settlements"). As of the Petition Date, the Debtors do not believe they have any accrued but unpaid fees on account of the Employment Claims Settlements.

44. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with

applicable workers' compensation laws and requirements. There are no current open claims under the Workers' Compensation Program. The Debtors do not pay Workers' Compensation claims because they are 100% covered under their policy.

45. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. Pursuant to the Interim Order, the Debtors seek authority, but not direction, to (a) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis;[6] and (b) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program, which will be covered 100% by the Debtors' insurer. Pursuant to the Final Order, the Debtors seek substantially the same relief as well as the authority to pay all Unpaid Workers' Compensation Coverage Fees.

**D. Retirement Plans.**

46. The Debtors offer eligible Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan"). The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. The Debtors match an Employee's 401(k) Plan contributions $0.50 on every $1.00, up to an amount equal to an Employee's first four percent of eligible compensation (the "401(k) Contributions"). Generally, the 401(k) Contributions are made by the Debtors just following each pay date. The 401(k) Plan is administered by Wells Fargo and allows for automatic pre-tax wage deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.

6 The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary, subject to applicable law.

47. Each pay period, the Debtors deduct the Employees' 401(k) Plan Contributions from the Employees' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are forwarded to Wells Fargo. The Debtors deduct approximately $75,000 in the aggregate each month from Employee's paychecks on account of the 401(k) Deductions. As of the Petition Date, the Debtors estimate that they are current on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions"), but include this description out of an abundance of caution and seek authority to remit Unremitted 401(k) Deductions if any become due.[7]

48. In the 12 months before the Petition Date, the Debtors' monthly payments and disbursements on account of 401(k) Contributions averaged approximately $30,000. As of the Petition Date, the Debtors estimate that they owe approximately $13,000 on account of 401(k) Contributions (the "Unpaid 401(k) Contributions"), all of which will become due and owing within the Interim Period. The Debtors also pay a 401(k) advisor, White Oaks Advisors (the "401(k) Advisor"), quarterly in an aggregate amount of $10,000 per year. As of the Petition Date, the Debtors owe the 401(k) Advisor approximately $2,500. The Debtors seek authority to honor their commitment to 401(k) Contributions (whether due prepetition or arising postposition), as well as payments to the 401(k) Advisor, in the ordinary course on a postpetition basis.

49. Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contribution provision. Thus, the Debtors believe that continuing the 401(k) Plan and the 401(k) Contributions are essential to maintaining Employee morale and protecting Employee expectations. In addition, the

[7] Given the timing of the last payroll, at the time of filing this motion, there may be 401(k) Deductions in transit to Wells Fargo.

Debtors believe that the 40l(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

50. Accordingly, pursuant to the Interim Order and the Final Order, the Debtors seek the authority, but not direction, to (a) continue the 40l(k) Plan in the ordinary course of business on a postpetition basis; (b) remit all Unremitted 401(k) Deductions collected in the ordinary course of business; and (c) pay any Unpaid 401(k) Contributions in the ordinary course of business (approximately $47,000 in the aggregate).

**E. Paid Time Off.**

51. In the ordinary course of business, the Debtors provide paid time off to their Employees (the "Paid Time Off"). Paid Time Off generally accrues at specified rates up to a maximum amount based on the applicable state limit, if any. Accruals of Paid Time Off, however, are not a current cash payment obligation. By this Motion, the Debtors seek authority, but not direction, to pay any "cash out" amounts required under applicable law with respect to earned but unused Paid Time Off and to continue the Paid Time Off policy in the ordinary course. For the avoidance of doubt, the Debtors seek to pay Paid Time Off to any Employee in excess of the $12,850 priority cap imposed by section 507(a)(4) of the Bankruptcy Code solely pursuant to the Final Order only.

52. In addition, the Debtors provide certain other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, and (c) other paid and unpaid leaves of absence for personal reasons, including those required by law. Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

53. The Debtors believe that the continuation of Paid Time Off is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based

programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued paid leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' regular payroll obligations.

**IV. Severance.**

54. In the ordinary course of business, the Debtors maintain a severance program for the benefit of certain executive and non-executive, non-Insider Employees (the "Non-Insider Severance Program"). Certain corporate Employees are eligible, on a discretionary basis. Pursuant to the Non-Insider Severance Program, eligible Employees, upon termination and on a discretionary basis, are entitled to receive payments at base compensation levels (based on years of service or if the Employee is a senior executive) in accordance with standard company practice (the "Non-Insider Severance Benefits"). Although there is no severance plan document, standard practice is that corporate employees receive two weeks of severance for every year of service, and senior executives get six months of severance.

55. The Debtors' ability to pay and provide severance amounts and other benefits has been critical to maintaining Employee morale and loyalty, particularly during the current store optimization. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to complete the store closing sales that are critical to generating immediate liquidity and to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. As a condition to receiving Non-Insider Severance Benefits as part of the Non-Insider Severance Program, the Debtors require that each Employee not have been fired for cause. The Debtors believe that the Non-Insider Severance Program and the Non-Insider Severance Benefits reduce the time and expense that would be spent defending against the assertion of claims by any severed Employees.

56. In the last 12 months, the Debtors have paid approximately $1,425,000 to former Employees on account of Non-Insider Severance Benefits. As of the Petition Date, the Debtors believe that approximately 26 former Employees are or will become entitled to Non-Insider Severance Benefits in the aggregate amount of approximately $321,200 during the pendency of these chapter 11 cases. By this Motion, the Debtors seek authority to honor prepetition obligations on account of the Non-Insider Severance Program and continue the Non-Insider Severance Program on a postpetition basis pursuant to the Final Order only.

**V. Postpetition Non-Employee Director Compensation.**

57. Certain of the Debtors maintain boards of directors (or boards of managers, as applicable) that include non-Employee directors (or managers, as applicable) (each, a "Director"). As of the Petition Date, the Debtors' boards of directors included 3 non-Employee Directors on an aggregate basis. The non-Employee Directors currently receive a $20,000 annual retainer, which is paid in advance on a quarterly basis in cash (the "Annual Retainer"). The non-Employee Directors are also entitled to expense reimbursement for out-of-pocket expenses (together with the Annual Retainer, the "Director Compensation"). As of the Petition Date, the Debtors do not owe any amounts on account of Director Compensation. The Debtors believe that they are authorized to pay any postpetition Director Compensation in the ordinary course; however, out of an abundance of caution, by this Motion, the Debtors seek authority to continue to pay the Director Compensation on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices on a final basis. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts on account of Director Compensation on an interim basis.

## Basis for Relief

### I. A Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

58. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle priority treatment to certain of the Employee Compensation and Benefits owed to the Employees. The Debtors are required to pay such priority claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

59. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor

to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

60. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers' compensation amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

**II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.**

61. Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing." Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Employee Compensation and Benefits as such actions are in the ordinary course of the Debtors' business. Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any disruptions to their business operations.

62. The relief requested herein may be granted by the Court pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b),

courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

63. In addition, the Court may authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of the Employee Compensation and Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity").

64. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.* 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").

65. The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

66. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

67. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits, the Debtors may experience turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become

demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts that might not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

68. Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here. *See, e.g.*, *In re True Religion Apparel, Inc.*, No. 17-11460 (CSS) (Bank. D. Del. July 6, 2017) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. June 27, 2017) (same); *In re Aquion Energy Inc.*, No. 17-10500 (KJC) (Bankr. D. Del Mar. 10, 2017) (same); *In re Basic Energy Services, Inc.*, No. 16-12320 (KJC) (Bankr. D. Del. Oct. 26, 2016) (same); *In re Key Energy Services, Inc.*, No. 16-12306 (BLS) (Bankr. D. Del. Oct. 25, 2016) (same).[8] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice.

---

[8] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.**

69. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

70. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

**<u>Processing of Checks and Electronic Fund Transfers Should Be Authorized</u>**

71. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, the proposed debtor-in-possession financing, and anticipated access to cash collateral. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily

identify checks or wire transfer requests relating to the Employee Compensation and Benefit obligations, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

72. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. Bankr. P. 6003. For the reasons discussed above, authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (ii) continue employee benefits programs in the ordinary course, including prepetition obligations related thereto, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations and, maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Reservation of Rights**

73. Nothing contained in this motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an

admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

74. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

75. The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP ABL Agent and the Prepetition ABL Agent; (d) counsel to the DIP Term Loan Agent; (e) counsel to the Ad Hoc Group of Term Loan Lenders;

(f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for all states in which the Debtors conduct business; (j) counsel to certain majority equity holders for Debtor Charming Charlie Holdings Inc.; (k) ADP; and (l) any party that requests service pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

76. No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: December 11, 2017
Wilmington, Delaware

*/s/ Domenic E. Pacitti*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

-and -

Morton Branzburg (*pro hac vice* admission pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-2700
Facsimile: (215) 568-6603

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher T. Greco (*pro hac vice* admission pending)
Aparna Yenamandra (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

James H.M. Sprayregen, P.C.
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*